CHARLES A. WILLIAMSON,
EX'R OF MARY ANN JONES
vs.
GEORGE C. MORTON ET AL.
} MARCH TERM, 1851.

[EXECUTOR—ASSIGNMENT BY—RULES OF EVIDENCE.]

A party who was executor and devisee, acting in those capacities, assigned a mortgage debt, part of the assets of his testatrix, to certain assignees, to secure the payment of his own debt, due to the latter—HELD—

That the assignees, by taking such an assignment, were aiding the executor in committing a *devastavit*, and acquired no title thereby.

In order to defeat the title of the alienee of an executor, in a court of law, it is necessary to show actual collusion between the executor and the purchaser or creditor.

But in equity, an executor or administrator can make no valid sale or pledge of the assets, as a security for, or in payment of, his own debts ; because the transaction itself gives the purchaser or mortgagee notice of the misapplication, and necessarily involves his participation in the breach of duty.

Though the courts are less disposed to disturb the title of an assignee, when the assignment is made for money advanced at the time, than when made for an antecedent debt, yet if it appears in the transaction itself, that the executor is about to misapply the money raised upon the assets of his testator, the mere circumstance that the advance of the money was cotemporaneous with the assignment, will not protect the lender.

When a person, dealing with an executor, must, from the very nature of the transaction, necessarily know that the executor was applying the assets to objects in conflict with his duty, he deals with him at his peril ; and a transfer, or an assignment, made under such-circumstances, will, in equity, be set aside at the suit of a creditor, a specific, residuary, or general legatee.

*Quere*, is not such a disposition of the assets prohibited by the act of 1843, ch. 304?

A party dealing with an executor, as such, has notice of the existence of the will, and of its contents: the will, in this State, being open to inspection upon the public records.

The court may very properly refuse to interfere actively in behalf of a party holding a security, and asking to have it made effectual, when the circumstances may not be strong enough to warrant a decree to compel him to surrender it.

The rule of evidence, that neither the husband or wife can be witnesses for or against each other, applies to a case in which the husband is offered to testify in favor of the wife, in reference to her separate estate.

This rule is founded, not on the ground of interest, but of policy, and extends to cases where the wife was afterwards divorced from the husband.

The only exception to this rule which was formerly recognized, was, where the husband commits an offence against the person of his wife, when, *ex necessitate*, the wife may make an affidavit against her husband.

The parol declarations of the husband, that he had obtained a receipt from his wife, who was one of the legatees in the will, as a matter of form, to enable him to settle an account as executor in the Orphans Court, and not upon actual payment, made at the time of settling, were held to constitute a part of the *res gestæ*, and, as such, admissible, to contradict and overthrow the receipt, though they might operate in favor of the wife.

THE CHANCELLOR:

The proceedings in this case show, that on the 6th of March, 1849, Charles A. Williamson, as executor of Mary Ann Jones, deceased, filed his bill in this court, for the foreclosure and sale of certain mortgaged premises, which, on the 17th of September, 1838, had been mortgaged by Susan Ann Leduc, deceased, to Levin Jones and Mary Ann his wife, (the latter being the testatrix of the complainant,) to secure the sum of $7000, the principal sum to be paid within ten years from the date of the mortgage, and the interest annually from said date. It further appears, that Levin Jones died in the year 1842, leaving his wife surviving him; and that, by his will, duly executed, proved and recorded, he devised and bequeathed his entire estate to his said wife; and that the latter, by her will, also duly executed, proved and recorded, devised and bequeathed her whole estate, subject to the payment of some legacies and debts, to her niece, Ann S. Williamson, (wife of the complainant, Charles A. Williamson,) "for her sole and separate use, benefit and behoof, for and during the term of her natural life, and from and immediately after her death, to her said husband, for and during the term of his natural life, in case he should survive his said wife; and from and after the decease of the longest liver of them, the said Ann S. and Charles A. Williamson, then for the proper use, benefit and behoof of the children or child of the said Ann S. Williamson, if any there be, equally, if more than one, their heirs, &c., forever. But in case the said Ann S. Williamson should die without leaving a child, or the descendant of a child, that shall survive her, then, from and after the death of both her and her aforesaid husband, to the person or persons that might be named and appointed in and by the last will of the said Ann S. Williamson, to re-

ceive the same; and in case of no such nomination by will, then, to her legal representatives, the sum of five hundred dollars; and the rest, residue and remainder of the estate (of the testatrix) not by her will otherwise disposed of, to be divided into two equal parts, one-half whereof she gave and devised to the children of her brother, William Jackson, their heirs, &c., forever; and the other half to the children of her sister, Elizabeth Thompson, their heirs, &c., forever." And she appointed the said Charles A. Williamson her sole executor, who duly qualified as such.

Upon the bill of Charles A. Williamson, as executor of Mary Ann Jones, which was filed against the parties claiming under the mortgagor, Susan Ann Leduc, a decree passed on the 17th of October, for the sale of the mortgaged premises; and a sale, by the trustee appointed for the purpose, was duly made, reported to, and ratified by the court; and by the report of the Auditor, (not yet confirmed,) the net proceeds of this sale are assigned to the said Williamson, as executor, in payment of the mortgage debt, leaving a balance still due thereon.

In this state of the proceedings, a petition was filed on the 30th of May, 1850, by Miller and Mayhew, stating that on the 1st of February, 1849, the complainant, Charles A. Williamson, executor and devisee of Mary Ann Jones, assigned to them the mortgage claim and the proceeds of the sale, as security for the payment of four promissory notes, drawn by Williamson, Sutton & Co., in favor of the petitioners, amounting to $5632 77; and praying for an order directing the trustee to pay them their claim out of the proceeds of the sale: and with this petition there was exhibited a paper, by which the said Williamson, for the purpose of securing the said four notes, or any other note or notes, which may be given in renewal thereof, assigned and transferred to the petitioners this mortgage claim, stated in the assignment to be due him, and then in the hands of his attorney for collection, with a direction that his said attorney pay said notes out of the amount he may collect under the mortgage. This assignment Williamson signed as executor and devisee of Mary Jones.

Subsequently, on the 10th of July of the same year, Ann S. Williamson, the wife of the complainant, by her next friend, filed her petition, stating her title to the proceeds of the sale, under the will of Mrs. Jones, the improvident assignment, by her husband, of a portion of the proceeds to the petitioners, Miller and Mayhew, to pay them the notes of a commercial firm of which he was a partner, his insolvency, and her consequent liability to loss, if he, or Miller and Mayhew, are permitted to receive the money; and praying that the proceeds of the sale be invested, under the authority of the court, for the purposes, and in the execution of the objects, of the will of Mrs. Jones, a copy of which was exhibited with the petition. And a petition by the parties entitled in remainder, was filed on the 28th of December of the same year, likewise praying that the proceeds of the sale should be brought into court, for the purpose of being invested.

In opposition to the petition of Mrs. Williamson, Miller and Mayhew, by their answer thereto, filed on the 16th of October, 1850, after speaking of the assignment by Charles Williamson to them, and the direction to his attorney, who held the mortgage for collection, to pay them the amount of the notes : say, and insist, that in point of fact, the said Charles A. Williamson, at the time of the assignment thereof as aforesaid to them, was truly the owner of the said mortgage debt, as he then assumed to be, and authorized in law to make a valid transfer to them of the same. That at the time of said assignment, the said Charles A. Williamson had in fact fully and finally settled, in the Orphans Court for Baltimore County, all accounts that could lawfully be demanded of him as executor of the said Mary Ann Jones, and had made a complete and final distribution of her entire estate, according to law, and in conformity with the provisions of her will.

With this answer, there was exhibited an account, passed by Charles A. Williamson, as executor of Mary Ann Jones, in the Orphans Court, on the 9th of October, 1848, in which he charged himself with the inventory of the personal estate of his testatrix, with cash received, and with the principal sum due

on the mortgage of Susan Leduc, and took credit for certain disbursements and payments of pecuniary legacies, for sundry negroes manumitted by the will, for certain articles of personal property, and cash allowed the accountant, being, as expressed in the account, "in full of the rest and residue of the personal estate of the deceased, which was bequeathed by her will to Ann S. Williamson, for her sole and separate use, for and during the term of her natural life, and delivered over to her, subject to the provisions and conditions mentioned in said will, as per release recorded appears."

The personal property embraced in this entry, and stated to have been delivered to Mrs. Williamson, amounted to $960, and the cash to $5761 90. And there was also exhibited, with the same answer, an official copy of a release, executed and acknowledged by her, before a justice of the peace, on the 7th of October, 1848, by which she acknowledged that she had received from the executor the articles of personal property and cash, for which he had been allowed credit in the account, being, as stated in the release, "in full of the rest and residue of the personal estate of the deceased, bequeathed to Mrs. Williamson, for her sole and separate use during her natural life."

The proceedings, however, show, that though the executor had only charged himself, in the Orphans Court, with the principal sum due on the mortgage in question, there was, at that time, also due upon it, about five years interest; and by an amended and supplemental petition, filed by Mrs. Williamson and the parties entitled in remainder, this omission of Williamson, the executor, to charge himself with this interest, is relied upon as indicative of unfairness and impropriety in the account; and the allegation is made, that he, (the executor,) did not pay Mrs. Williamson the balance in cash appearing to be due by said account, or give her any security or satisfaction therefor; and that the release, set up in the answer of Miller and Mayhew, was executed by her, without receiving any consideration, without knowledge of its contents, and in ignorance, in fact, of her rights.

Several witnesses have been examined by the parties, and

to portions of the evidence, on both sides, exceptions have been filed.

On the part of Mrs. Williamson, and the parties entitled upon the determination of her life estate, it is objected, that Miller and Mayhew are precluded from offering any evidence to show that the assignment to them, of the 1st of February, 1849, was executed by Charles A. Williamson, to convey or assign, or did convey or assign, any interest of said Williamson, in his own right, as purchaser or owner of the mortgage mentioned in the assignment, or any interest therein, other than that which he held as executor and devisee of Mrs. Jones, his testatrix; and they except to the admissibility and competency of any and all evidence on the part of Miller and Mayhew, tending to show that they dealt with said Williamson, in the matter of the said assignment, in any other capacity than that of executor and devisee.

If this exception is well taken, it seems to me it must be conclusive of the controversy between these parties; because it is too obvious for dispute, that Miller and Mayhew, by taking an assignment of this mortgage, to secure the payment of the notes of Williamson, Sutton and Company, were participating in and aiding the executor in diverting the assets of the estate from their proper destination; that is, in committing a breach of trust or *devastavit*.

Regarding Mr. Williamson simply as the executor and devisee, and supposing Miller and Mayhew to be clothed only with the rights which, in those capacities, he could confer upon them, it is most manifest, they were, by this transaction, aiding him in a gross misapplication of the assets, contrary to his duty as executor, and as is well settled by the authorities, which are collected in 1 *Roper on Legacies*, 303; an assignment to them, under such circumstances, gives them no title. In a court of law, the rule is supposed to be less strict, for there, in order to defeat the title of the alienee of the executor, it appears to be necessary to show actual collusion between the executor and the purchaser. There must be *contrivance* between the executor and his own creditor, to enable the former to commit a *de-*

*vastavit*, to except the case out of the general power of the executor to dispose of the estate. But in equity, it seems now to be established, (contrary to the earlier cases,) that an executor or administrator, can make no valid sale or pledge of the assets, as a security for, or in payment of, his own debts, upon the ground, that the transaction itself gives the purchaser or mortgagee notice of the misapplication, and necessarily involves his participation in the breach of duty. The authorities brought together and referred to in 2 *Williams on Executors*, 612, seem clearly to maintain this principle; and especially the cases of *Hill* vs. *Simpson*, 7 *Ves.*, 152; *McLeod* vs. *Drummond*, 17 *Ves.*, 154, and *Field* vs. *Schieffelin*, 7 *Johns. Ch. Rep.*, 155. In the last case, the Chancellor said, that, upon full examination of the authorities, he found a perfect agreement in this: "that the purchaser from the executor would be safe, if he is no party to the fraud in the executor, and had no knowledge or proof that the executor intended to misapply the proceeds, or was, *in fact, by the very transaction*, applying them to the extinguishment of his own private debt." "The great difficulty has been to determine how far the purchaser dealt at his peril, when he knew, from the very face of the proceeding, that the executor was applying the assets to his own private purposes, as the payment of his own debts;" "and that the later and better doctrine is, that, in such a case, he does buy at his peril."

Some of the cases distinguish between taking from the executor, as a pledge, assets, for an *antecedent* debt, and for money advanced at *the time* of the transfer; and as to the first, it is said, all the cases agree, that the interest of the pawnee is defeasible by creditors, or legatees, whilst, with reference to the latter, the validity of the contract depends on the same considerations that would effect an absolute sale, under like circumstances. 2 *Wms. on Exrs.*, 612, note (1.)

It will be found, I think, upon an examination of the cases, that though the courts are less disposed to interfere with the title of the assignee, when the assignment is made for money advanced at the time; yet that circumstance is very far from

being conclusive, and if it appears, *in the transaction itself,* that the executor is about to apply the money raised upon the property of his testator, to objects at variance with his duty as executor, the mere circumstance that the advance of the money was cotemporaneous with the deposit of the securities, will not protect the lender. This was evidently the strong inclination of the mind of Lord Eldon in the case of McLeod vs. Drummond, already referred to. His lordship there said, "he should hesitate to say, that as the temptation was so slight, (referring to the ordinary motive with money lenders,) this court would not examine whether that was not a most inequitable transaction with reference to the persons entitled to that property."

And he was manifestly of opinion, concurring with Sir William Grant, Master of the Rolls, in *Hill* vs. *Simpson,* 7 *Ves.,* 152, that an advance of money, under circumstances which must have apprised the lender that the executor was violating his duty as such, by applying the money to objects not connected with the affairs of his testator, would so completely vitiate the transaction, that an assignment of the assets to secure such advances, would be set aside, in favor of general or residuary legatees. Direct fraud need not be shown : it is sufficient to condemn the transaction, if it appears that the lender of the money must, from the character of the transaction, have known that the executor would misapply it.

This principle is certainly not in opposition to anything said or decided by the Court of Appeals of this state, in the case of *Allender* vs. *Riston,* 2 *Gill & Johns.,* 86. On the contrary, the authorities which establish it, are cited in terms, from which it may fairly be inferred, that they were approved of, or, at all events, nothing fell from the court, in that case, from which their disapprobation of the doctrine can be deduced.

I take it, therefore, to be established upon authority, and upon reasons which commend themselves to my judgment, that though a person dealing with an executor, may ordinarily repose upon the general presumption that he is acting in the due exercise of his trust; yet when, from the very nature of the transaction, such person must necessarily know that the execu-

10*

tor was applying the assets to objects in conflict with his duty, he deals with him at his peril ; and that a transfer or an assignment, under such circumstances, will, in a court of equity, be set aside, either at the suit of a creditor, a specific, residuary or general legatee.

These views are fully sustained, in the opinion delivered by the Chief Justice of the United States, in the case of *Lowry* vs. *The Commercial and Farmers Bank of Baltimore et al.*, decided in the Circuit Court for the Maryland District, at its July term in the year 1848. In that case it was held, that though an executor might, according to the law of England, and of this state prior to the act of 1843, ch. 304, sell, or raise money on, the property of the deceased, in the regular execution of his duty, and the party dealing with him is under no obligation to inquire into his object, nor liable for his misapplication of the money ; yet, if the party so dealing with an executor, has, at the time, reasonable ground for believing that he intended to misapply the money, *or is, in the very transaction,* applying it to his own private use, the party dealing with him under such circumstances, is responsible to the persons injured. And in the same case, it was further held, that the party dealing with an executor, as such, has notice of the existence of the will, and of its contents ; the will, in this state, being open to inspection upon the public records.

The case now before this court is stronger against the validity of the transaction in question, than that in the Circuit Court. There, the transaction took place prior to the act of 1843, ch. 304, which imposes restraints upon the power of executors, or administrators, in disposing of the property of their testators or intestates. Here it was subsequent, and it may, I think, very well be doubted, whether, even assuming the law would sanction such a disposition of the assets, by an executor, independent of this statute, it can now be supported. It is, of course, not meant to be said or intimated that an executor may not, notwithstanding the statute, collect moneys due the deceased, without an order of the Orphans Court; and that a payment would not be valid without such an order. It is the duty

of the executor to collect moneys due the deceased, and it was certainly not the design of the legislature to interfere, in any way, with the performance of that duty. But the transaction now under consideration is very different from a mere collection, by the executor, of moneys due his testator. In dealing with Miller and Mayhew, by assigning them this mortgage, he was not collecting the mortgage debt due his testatrix—that debt was then in the hands of an attorney for collection, and, by the assignment of it to Miller and Mayhew, as security for money advanced by them to him, he was disposing of the property of the deceased for his own private use. Now, if the act of assembly condemns and invalidates the sale of the property of the deceased, by an executor or administrator, without the previous authority of the Orphans Court, even though the purchase money be duly applied to the purposes of the estate, (and such would seem to be the effect of the act,) how much more liable to objection is a transfer of the assets, when, upon the very face of the transaction, the party receiving them could not fail to know that the consideration paid for them would be misapplied.

But the court, in this case, is not asked to compel these parties, Miller and Mayhew, to deliver up a security placed in their hands by the executor; but they are here, asking the court to give them the benefit of it, by directing a payment to be made them, out of funds raised upon a bill filed by the executor, in that capacity, against one of the debtors of his testatrix. The aid of the court, then, is asked to consummate a *devastavit* on the part of the executor. That is, to divert the assets of the estate from their legitimate purpose, to the payment of a debt contracted by the executor for an object having no connection with the affairs of his testatrix, and under circumstances which must, upon the face of the transaction, have informed the parties with whom he was dealing, that the money which they loaned him would be applied to objects foreign from his duty as executor.

But there is a material difference, as was said by Lord Eldon in *McLeod* vs. *Drummond*, 17 *Ves.*, 167, "between direct-

ing an instrument to be delivered up when upon the circum-stances under which it was deposited, that would be too much, and in equity, calling upon that person and others to make it effectual." In the latter case, the court might very properly say, it would not interfere actively in behalf of the party holding the security and asking to have it made effectual, when the circumstances might not be strong enough to induce it to compel him to surrender it.

The title of these parties, however, it is said, does not rest upon the mere assignment of Charles A. Williamson as executor and devisee. It is also insisted, that he had at the time of the assignment, become the absolute owner of the thing assigned (the mortgage,) by settling a full and final account in the Orphans Court, and making a complete, and final distribution of the estate according to law, and according to the provisions of the will of the testatrix. And a copy of the account so settled by him, and the release of Mrs. Williamson is exhibited, and relied upon in support of this view of the case.

It is manifest, however, upon an inspection of the account, that the executor did not charge himself with the amount due on this mortgage : because he is only charged with the principal thereof, when it is evident from the proceedings, and upon the face of the mortgage itself, that there was then due, nearly, or quite five years interest, which would have considerably swelled the cash balance apparently in his hands, and which, by the release of Mrs. Williamson, he appears to have paid over to her as the residuary legatee for life, of the testatrix.

But although the account is in this respect clearly erroneous and prejudicial to the legatees : still it is most plausibly urged, that as Mrs. Williamson, by executing this release, had admitted herself to be fully satisfied, it would not be just to permit her to say the contrary, as against a party who had dealt with the executor, in the confidence that she was so satisfied. And it is likewise insisted, that there is no competent proof in the cause to show, that she did not receive from the executor, the money specified in the release.

The release is dated on the 7th, and was recorded in the

Orphans Court on the 9th of October, 1848, being the same day on which the executor passed his account. And the assignment by Williamson as executor and devisee to Miller and Mayhew, bears date on the 1st of February, 1849; and it becomes material to consider, whether, at the time of the assignment they were aware of the existence of the release : because if they were, it must strike the mind as unjust, to permit Mrs. Williamson to say, that she executed the paper without receiving the consideration. I now put out of view the objection, that Miller and Mayhew are precluded from setting up any title, to the proceeds of the mortgaged property, other than that which Williamson did, and could transfer to them, as executor and devisee : and assume that if they knew when they made the loan to Williamson, Sutton & Co., of the existence of the release, and had no reason to doubt that the executor had, in fact, paid the money to her, that they ought not to be deprived of the benefit of the security.

Looking to the parol evidence in the case, I strongly incline to think, that when they made the advance, they did not know of the existence of the release. And in addition to the parol evidence, the papers upon their face, lead to the same conclusion. In the assignment, the executor does not profess to pass any title which he may have acquired as purchaser, or in consequence of having paid the money to the residuary legatee He assigns as executor and devisee, and it must be supposed, he intended to transfer no title, but such as belonged to him in those capacities. And in the petition filed by the assignees on the 30th of May, 1850, sixteen months subsequently, they claim to be paid out of the proceeds of sales, allowed Williamson as executor and devisee in virtue of an assignment made to them by him, as executor and devisee, and in no other capacity or right. It was not until the 16th of October following, when they filed their answer to the petition of Mrs. Williamson, that they took the ground, that Williamson, the executor, had become the owner of the mortgaged debt, by having settled his account in the Orphans Court and paid over and distributed the entire estate, among the parties entitled, and had taken a release.

There is, moreover, very pregnant evidence to show, that even if these assignees, knew of the actual existence of the release, they also knew that the money had not in fact been paid.

The house of Williamson, Sutton & Co., of which Williamson, the executor, was a partner, and for whom the money was borrowed, was known by Miller and Mayhew to be greatly embarrassed, and raising money upon the most disadvantageous terms. The negotiations with them must have fully apprised these assignees, of the desperate condition of the affairs of the house of Williamson and Company : and with this knowledge, even if they had known of the account settled in the Orphans Court, and the release, they would have been disposed to regard them more as matters of form than substance.

It would have occurred to these gentlemen, as strange, that Williamson, should in October, 1848, advance his wife in money on account of a mortgage not then paid, $5761 90, and, in February following, should come to them, and on the security of this same mortgage, propose to borrow of them, nearly the same amount which he had four months before paid his wife ; and to borrow upon terms, which none but parties in failing circumstances will submit to.

I am, therefore, of opinion, that Miller and Mayhew did not know of the existence of this release, when they took the assignment in February, 1849, or if they did know of it, they also knew or had the strongest grounds for believing that it was a mere formal transaction and nothing more, and that seeing that the executor was about using the assets of the estate, in flagrant violation of his duty, by using the money raised upon a pledge of them, in supporting or attempting to support a failing commercial firm, they cannot come here and ask this court to give efficacy to the pledge, against the parties entitled under the will.

But it is also contended by the solicitor of the assignees, that there is no evidence that the executor did not, in point of fact, pay the money to Mrs. Williamson, as expressed upon the face of the release : and I am certainly prepared to admit that if he did so pay, she can have no claim to ask to be paid a second

time.    The direct evidence of the non-payment, is, that of Mr. Williamson himself, and this is excepted to, upon the ground, that as the husband of Mrs. Williamson, he is an incompetent witness.

Authorities have been cited to show, that the general rule, according to which neither the husband or wife, can be witnesses for or against each other, does not apply to a case in which the husband is offered to testify in favor of the wife, in reference to her separate estate.    The case of *Richardson* vs. *Learned*, 10 *Pick. Rep.*, 261 and 22 *Pick. Rep.*, 253, are relied upon in support of this exception to the rule, and certainly do seem to sustain it.

It seems to me, however, to be extremely doubtful, whether any such distinction is warranted by the cases establishing the general rule, or by the policy upon which the decisions have been founded.    The case of *Stein* vs. *Bowman*, 13 *Peters*, 221, affirms the general rule, and states the exception to it, and the only exception which seems then to have been recognized, and that is, where the husband commits an offence against the person of his wife, when *ex necessitate*, the wife may make an affidavit against her husband.    And the rule according to the language of Mr. Justice Grose in the case of *The King* vs. *Cliviger*, 2 *Tenn. Rep.* 268, which the Supreme Court appear to quote with approbation, is founded not on the ground of interest, but of policy ; and as asserted by Lord Ellenborough in *Averson* vs. *Kinnard*, 6 *East.* 192, extends to cases where the wife was afterwards divorced from the husband, upon the principle, that the confidence which subsisted between them at the time, shall not be violated, in consequence of future separation.

I am, therefore, not prepared to say, notwithstanding the weight which is justly due to the high authority of the Supreme Court of Massachusetts, that the husband is a competent witness, when the case involves the separate estate of the wife ; and consequently, in examining the question whether Mrs. Williamson did, or did not receive the money, as stated in her receipt to her husband, dated the 7th of October, 1848, I shall disregard the testimony of her husband.

My opinion, however, is, that there is sufficient evidence in
the record, to disprove the receipt, independent of the evidence
of Mr. Williamson.   In the first place, his pecuniary condition
at the time, pressed as he obviously was to command resources
to sustain the credit of his commercial firm, then struggling
with difficulties which subsequently overwhelmed it.   His
anxiety and efforts to borrow money upon almost any terms for
this purpose, render it in the highest degree improbable, that
he could, or would, have been willing to advance this large
sum upon a mortgage not then paid, and when he was under
no obligation to do so.   In the second place, it is clear, upon
the face of the account settled by him in the Orphans Court,
and upon the testimony of Mr. Glocken, the deputy register,
that the release was a mere matter of form, to enable the ex-
ecutor to close the matter in the court.   And in the third place,
the declarations made by the executor to Glocken, show, I
think, very satisfactorily, that the money was not in fact paid.
It is evident, from these declarations, that Mr. Williamson
supposed he was, as husband, entitled to retain the balance
appearing to be due from him as executor.   That this impres-
sion continued down to the period ;of the execution of the re-
lease, is evident from declarations made by him to the witness
at that time, as appears from the cross examination; because,
as stated by the witness, Mr. Williamson reiterated to him,
when the account was settled, his belief that the release was
not necessary, and that he was not bound to obtain it, in order
to settle his account.   These declarations, then made, may, I
think, fairly be regarded as part of the *res gestæ,* and, with the
other circumstances, are sufficient to raise a strong presumption
that the money was not paid.   The release and the account
were filed and passed on the same day, and were part and par-
cel of one and the same transaction; and statements made by
the executor at that time should be received, to show its true
nature and character.   Suppose, instead of making these ver-
bal statements, Mr. Williamson had left with the deputy of the
register, a writing to the effect that he had not actually paid
the money to his wife, and had merely procured from her the

release, to enable him to close his accounts with the court, could it be contended, that such writing would not be evidence to disprove the receipt, because he is her husband, and the rule forbids the husband to testify for the wife? It seems to me very clear that it could not successfully be so contended.

But if the verbal declarations of the husband made under such circumstances are to be excluded, because they may operate in favor of his wife, his written declarations would be inadmissable for the same reason ; the only difference between them being, that there is less danger of misapprehension when the declarations are reduced to writing, than when they rest in the memory of the witness. The evidence in the two cases, differs in degree, but not in kind.

By receiving these statements, there is, I think, no invasion of the rule, that husband and wife cannot be witnesses for or against each other. The husband procures a receipt from his wife, to enable him to settle his account in the Orphans Court, and when in the act of settling, he makes declarations going plainly to show that the receipt was procured for that purpose simply, and not upon actual payment. Now may not such declarations be received to explain the transaction as part of it? I think they may, and if so, they would I am persuaded, induce a jury to believe that the money was not paid. When these declarations were made, the rights of third parties were not involved, the husband alone was concerned, he stood in the relation of trustee to his wife and the parties entitled in remainder ; and their only effect, regarding them as occupying the relation of trustee and *cetuisque trust*, was to show that he had procured evidence to prove a payment which he had not made. In other words they contradict and overthrow the receipt, which, according to the well established rule of evidence, may be done by parol.

My opinion, therefore, is, that the assignment of Mr. Williamson to Miller and Mayhew, of the 1st of February, 1849, cannot be allowed to stand against Mrs. Williamson, or the legatees in remainder. In the account settled by Williamson in the Orphans Court, on the 9th of October, 1848, in which he was

charged with the principal only of this mortgage debt, the cash balance in his hands (treating this principal as cash,) was only $5761 90, and that is the amount for which she receipted to him as cash.   There was, however, at that time a large sum due for interest, sufficient, perhaps, to cover the difference between the cash balance with which the executor stood charged, and the principal of the debt; and if so, he should have paid to her the entire principal ; because in that event, such payment would not have made him a creditor of the estate, as for an over payment.   If when the proper accounts are stated, it shall appear, that throwing this mortgage out of view altogether, Mr. Williamson has over-paid the estate : that is, if the assets which came to his hands, independent of the mortgage, are insufficient to cover his disbursements and allowances, excluding the sum of $5761 90, appearing by the account to have been paid to his wife, but which in fact was not paid, he must be regarded as a creditor for such excess, and Messrs. Miller and Mayhew, as his assignees, will, in respect thereof, be entitled to be paid out of the proceeds of the sales in this case. The residue of said proceeds, must, according to the decision of the Court of Appeals, in *Evans et al.* vs. *Iglehart et al.*, 6 *Gill & Johns.*, 162, be invested in some safe and productive fund, so as to secure the interest to Mrs. Williamson during her life, and the principal after her death to the legatees in remainder.   And the case will be referred to the Auditor, with directions to state an account or accounts in conformity with this opinion, preparatory to a final decree.

S. T. WALLIS and F. K. HOWARD for Petitioners.
WM. F. FRICK for Miller and Mayhew, Respondents.