Sewell *vs.* Slingluff.

(Decided 19th December, 1884.)

CAROLINE D. SEWELL *vs.* FIELDER C. SLINGLUFF.

*Administration acccunt—Mistake—Husband and Wife—Ques-tions of Account between a Distributee and the Legatee under a Subsequently established Will.*

The accounts of an administrator passed by the Orphans' Court are only *prima facie, against,* as well as for him; and he has the same right with other parties to show error or mistake therein.

F. C. S., as administrator of E., who was his deceased wife, finally settled her estate, and paid over to himself as distributee, under the order of the Orphans' Court, the whole of her personal property, after payment of her debts and the expenses of administration.   This was done when it was supposed by all the parties in interest, that E. had died intestate, or that a will which she had left was inoperative and void.   Subsequently, upon the offer of C. D., the mother of E., said will was admitted to probate and letters

Sewell *vs.* Slingluff.

of administration *c. t. a.* were granted to her. After the will had been admitted to probate, F. C. S. paid to C. D., as administratrix *c. t. a.*, what he claimed to be the *whole* of the personal estate that came into his hands as the supposed distributee of his wife. A bill was subsequently filed against him by C. D., as legatee of E., calling on him to account for the property received by him as the supposed distributee of the latter. The estate of E. consisted in part of the proceeds of the sale of certain land sold by her in her life-time, in which her mother had a dower interest. As her mother was then living with her, it had been agreed that said dower interest, should be retained by E., in lieu of her board. After the death of E., and after the settlement of her estate, C. D. left the house of F. C. S. On her thus leaving, he paid her the amount of her said dower interest, thereby diminishing the estate he got from his wife, to that extent. HELD :

That F. C. S., in accounting with C. D., was entitled to a credit for the amount so paid to her.

It further appeared, that F. C. S. and his wife, who, together with C. D., had been living in the country, determined to move into the City of Baltimore to live. It was agreed that his wife should lease a lot and build thereon a house which was to be the future home of her husband, her mother, and herself. F. C. S. was to support the family by his profession. In accordance with this agreement the lot was leased and the house planned and begun. Long before it was finished, E. died. Her husband, supposing himself tenant for life with remainder to his child, went on and finished the house in accordance with the general original plan; and when finished, he and his son and mother-in-law moved into it. The cost of the house was paid for with the money of the wife, partly in her life-time, but mostly by F. C. S., as her administrator after her death. When it was found that the property did not belong to him, he tendered the house to C. D., and she accepted it, nothing being said at that time about its value. HELD :

That C. D., having accepted the house, F. C. S. was justly and equitably entitled to be relieved from liability to the extent of the cost thereof, incurred after the death of his wife.

APPEAL from the Circuit Court of Baltimore City.

This appeal was taken from the decree of the Court below, dismissing the bill of the complainant, with costs. The case is stated in the opinion of this Court.

The cause was argued before ALVEY, C. J., STONE, MIL-
LER, IRVING, RITCHIE, and BRYAN, J.

*Bernard Carter, E. Otis Hinkley,* and *I. Nevett Steele,*
for the appellant.

*John Prentiss Poe,* and *S. Teackle Wallis,* for the ap-
pellee.

STONE, J., delivered the opinion of the Court.

After the decision of the case of *Sewell vs. Slingluff* in
57 *Md.,* 537, Mrs. Sewell, the complainant in this case,
offered for probate the will of her daughter, Mrs. Ella
Slingluff, and the same was duly probated, and letters of
administration *c. t. a.* were granted to her by the Orphans'
Court of Baltimore County. Long before the probate of
this will Fielder C. Slingluff as *administrator* of Ella, his
deceased wife, had finally settled her estate, and paid over
to himself as distributee, under the order of the Orphans'
Court the whole personal property of Ella, after the pay-
ment of her debts and the expenses of administration. All
this was done when it was supposed by all the parties in
interest, that Ella had died intestate, or what amounted
to the same thing, that the will she left was entirely in-
operative and void. The reasons for such belief will be
found set forth at length in the above mentioned case in
57 *Md.,* and it is not important to recapitulate them now.

Immediately after the probate of the will, and the grant
of letters of administration *c. t. a.* to Mrs. Sewell, Fielder
C. Slingluff asserts that he paid over to her as such ad-
ministrator, the *whole* of the personal estate that came
into his hands as supposed distributee of Ella, his wife,
and for which he could be held justly liable.

Mrs. Sewell on the contrary, while she admits the pay-
ment to her by Mr. Slingluff of a part of the personal
property of her daughter, denies that he has paid over to

her the whole of the property that she is legally and equitably entitled to, and hence this suit.

It is a bill in equity, filed by Mrs. Sewell as legatee of her daughter, against Mr. Slingluff, calling on him to account for the property of his wife, received by him as her supposed distributee. He has answered the bill, claiming that he has already accounted to her for the whole of it. A great deal of proof has been taken, and it now devolves upon us to say whether he has, or has not, sufficiently accounted to her.

There have been various objections urged by the defendant against the maintenance of this suit, besides the one which rests upon its merits. He insists that the complainant has a full and complete remedy at law, and that therefore a bill in equity will not lie; that whether she sues at law or in equity, she must bring the suit as administratrix *c. t. a.* and not as she has brought this suit *as legatee;* and he further pleads limitations and laches as a bar to the action.

Without deciding upon the validity of any of these objections, we will proceed in the first place to examine into the substantial merits of the claim of the complainant. If it shall be found that she has no just cause of action against the respondent, and that he has in fact accounted to her for all that, according to law and equity, he was required to do, then there will be an end, not only of this, but of all other and future suits, about this property. It would be useless indeed to render a decision about the form of an action, if we believed that no action whatever would lie. We have, therefore, determined to examine into the merits of the case.

Before we look into the facts, it will be proper to dispose of a question of law raised by the appellant, and which she, through her counsel, insists upon with great earnestness. The proposition advanced by her is that the accounts of an administrator passed by the Orphans'

Court, while *prima facie* only to all the world beside, are conclusive against the administrator himself.

In this she is clearly mistaken in part. Such proceedings are only *prima facie* for, as well as against the administrator. He has the same right to show error or mistake, that third parties have. *Ruby & Longnecker vs. State, use of Vernay,* 55 *Md.,* 490, and cases there cited.

It is important to settle this point, because the accounts of the administrator are involved in this suit, and play an important part in its settlement.

In order to determine the amount of the personal property of Ella Slingluff, received by Fielder C., as her supposed distributee, we must examine his administration accounts, and after finding out what he received, then to determine from the proofs in the case, what he has paid over to Mrs. Sewell, and what amount, if any, is still due her.

The net amount of the personal estate of Ella Slingluff paid over to Fielder C., as supposed distributee, amounted, as per the final account passed by the Orphans' Court to $30,591.63. The articles making up this amount were put down at their appraised value. Among the articles so paid over was a house, which was appraised at $6,000. As the principal difficulty in this case seems to have arisen about this house, we will exclude it from the account in the first instance, and deal with it afterwards. Excepting this house from the inventory and accounts by deducting its appraised value from the amount received by Fielder C. as distributee, it will leave $24,591.63, as the amount to be accounted for by the respondent to the complainant. This sum is accounted for, in part in the following manner, according to the proof in the case.

The respondent paid over to Mrs. Sewell stocks, and specific articles, the appraised value of which amounted in the aggregate to $3336.50. This amount includes the

appraised value of a horse that died, but which stands upon the same footing as the articles paid over.

The respondent is also entitled to a credit for the difference between the appraisement and sales of the Western Telegraph stock which sold for $1595 less than its appraised value. The appraised value made a part of the amount charged against him, and as it sold for less, he is entitled to a credit for the difference. It may be remarked that this stock was sold with the full knowledge of Mrs. Sewell, who held stock of her own in the same company, and which she sold at the same time and price, and acting under the same advice that Mr. Slingluff did.

In addition to these amounts Mr. Slingluff paid a United States tax amounting to $432.82 which he inadvertently omitted to obtain a credit for in his account, and which he is justly entitled to have an allowance for now.

It also appears very clearly from the proof in the case that the estate of Mrs. Ella Slingluff consisted, in part, of the proceeds of the sale of a tract of land in Baltimore County, and which was sold by her in 1867 for $16,000. Her mother, Mrs. Sewell, was entitled to a dower interest in this property; commuting her dower interest for 1-7 of the purchase money it would be $2285.71. But as she, Mrs. Sewell, was then living with her daughter, it was agreed that this dower should be retained by Mrs. Slingluff in lieu of her board. But when in 1873, long after the settlement of the estate, Mrs. Sewell left Mr. Slingluff's house, he paid over to her that amount, thereby diminishing the estate he got from his wife to that extent, and he is therefore entitled to a credit for that amount.

Adding up all the aforegoing sums they amount to $7650.03, and deducting that sum from the $24,591.63 there remains $16,941.60 to be accounted for by Mr. Slingluff, throwing out of view the house.

But Mr. Slingluff tendered, and Mrs. Sewell accepted this house. Nothing was said or agreed upon between

Mrs. Sewell and Mr. Slingluff at the time of the tender and acceptance of the house by Mrs. Sewell, as part of the estate of her daughter, as to its value. Mrs. Sewell now insists that Mr. Slingluff is only entitled to a credit for the appraised value of the house, and Mr. Slingluff contends that he is justly and equitably entitled to a credit for what the house actually cost *the estate* of Mrs. Slingluff. The proper determination of that question necessitates an examination of the circumstances of the case.

In 1868, Mr. and Mrs. Slingluff, together with Mrs. Sewell, were living in the country. About that time they determined to move into the city, and establish their home there. It was agreed that Mrs. Slingluff, who was possessed of a moderate fortune, should lease the lot and build the house, which was to be the future home of her husband, mother, and herself. Mr. S. was to support the family by his profession. In accordance with this agreement, the lot was leased and the house planned and begun. Early in January, 1869, and long before the house was finished, Mrs. Slingluff died. Mr. Slingluff, supposing himself tenant for life, with remainder to his child, went on and finished the house in accordance with the general original plan, and when finished he and his son and Mrs. Sewell moved into it, and lived there together in perfect amity until 1873. The cost of that house was $20,504.92, every dollar of which was paid for with the money of Mrs. Slingluff. $3000, part of this sum was paid during her life-time, and therefore can have nothing to do with her estate, but the balance, that is to say the sum of $17,504.92, was paid by him as administrator of his wife after her death. The mortgages and money of the wife, which were included in her inventory, &c., were converted into this house to the extent of $17,504.92. The money was not spent or wasted, but the form of the investment was changed. All this was done in the utmost good faith, and in carrying out a purpose begun and contracted for with

the approval of, and for the benefit of, the wife. When it was found out that the property did not belong to him, Slingluff at once tendered the house to Mrs. Sewell and she accepted it. Nothing was said about its value at that time. If Mrs. Sewell had a right of election, that is the right to demand the $17,504 in money (which we do not mean to say that she had) instead of the house, she certainly ought to have exercised that right before she accepted the house. She cannot have both the house and its cost. She cannot after taking the house, fix its price.

But apart from this, it is an old and familiar principle, that as between the parties a Court of equity will treat that as done, which ought to have been done, or which it would have decreed to be done had application been made to it. If Mr. Slingluff had applied to a Court of equity in 1869, and immediately after the death of his wife, for authority to go on, and complete the house begun by the wife, and complete it with her money, would it have been so ordered? We can see no reason why it should not have done so, but many reasons why it should.

Before the death of his wife, the family of Mr. Slingluff, a rising young lawyer, consisted of himself, wife, and wife's mother. The family seem at that period to have been closely united by the ties of affection. Believing that it was for his interest to live near the theatre of his professional labors, (Baltimore City,) the wife agreed to sell her property in the country, and buy or build a house in the city, to be a home for them all.

It was finally determined to build, and the house was begun, and many of the contracts and estimates were made, but before it was a third completed the wife died. She died leaving an infant child, and more than sufficient means to finish the house in the style originally contemplated. It was believed by all, that the property she left belonged to her husband, for life, with remainder to her child. In this state of affairs there was only one of two

things for him to do; to sell the house in its unfinished state, or to go on and complete it. There were many objections to the former course. The house, in its then state, would in all probability have been sold at a great sacrifice, and he would have been liable to actions at the suit of contractors. Although his wife was dead, a home was desirable for himself and his child, to say nothing of Mrs. Sewell. Under these circumstances we cannot conceive that a Court of equity would have hesitated a moment in authorizing him to go on and complete the house. Besides the personal comfort to them both, it would have been, perhaps, the safest investment of the money for the benefit of the infant. There was at that time no statute law requiring the administrator of the wife to exact security from the surviving husband for the money paid over to him as life-tenant, with remainder to the child. There was danger at least of loss to the remainderman, if the money was spent, and the husband became insolvent. But invested in this house it was comparatively safe, and we think no Court of equity would have hesitated to order the conversion of a portion of her estate into this house. We will therefore treat it as done, and consider the money invested in that house, as the money of Mrs. Slingluff, invested in that security and that upon the receipt of the house Mr. Slingluff is justly and equitably entitled to be relieved from liability to the extent of the cost incurred after the death of his wife.

The amount so invested in the house is more than the balance due Mrs. Sewell, and the decree of the Court below will be affirmed with costs.

Two very important considerations have been kept steadily in view by the Court in deciding this case. One of these considerations is the fact that the rights of creditors or third parties are in no manner involved in, or affected by it.

It is a matter entirely and exclusively between the complainant and the respondent.

The other is that we are satisfied from the history of the whole case, unfolded to us by the several records, that both these parties were acting with entire good faith at the time this house was finished.   While they were both mistaken as to their legal rights, yet it was an honest mistake, and untinctured by fraud or deceit.   We therefore lay no stress whatever upon any knowledge or acquiescence of Mrs. Sewell.   Ignorant of her rights, no estoppel can operate against her.   But we have placed our judgment upon the ground, that the completion of the house was an investment of the money of the estate, made in good faith, and which investment those now claiming the estate must receive, if it would not now in market bring what it cost.

*Decree affirmed, with costs.*

