# William P. Shinn's Estate.   William H. Shinn's Appeal.
## Trenton Iron Company's Appeal.

*Executors and administrators—Surcharge—Expenditure of money on foreign property—Devastavit.*

The mere fact that an administrator expends money in a reasonable effort to save the property of his intestate situated in another state, is not sufficient to convict him of a devastavit.

To hold that the representative of the personal estate within the domicile owes no duty whatever, either to creditors or next of kin, with reference to personalty outside the jurisdiction, is to invite neglect and consequent waste and dissipation of assets. By MR. JUSTICE DEAN.

*Executors and administrators—Use of money in speculative venture—Surcharge.*

Decedent owned a lease of iron ore property in which he had invested a large amount of money. The undertaking was of a highly speculative and hazardous nature. The ore was uncertain, both as to quantity and quality, and the cost of production was not known with even proximate certainty. The value of the ore when ready for the furnace was certain to be subject to the wide fluctuations of the iron market. The administrator, without consultation with creditors, and with no cautionary order from the court, and simply upon the advice of the next of kin, whose only hope for a share in the estate was in the preservation of the lease, expended a large amount of the money of the estate upon the leasehold. The business proved a disastrous failure, and a large sum was lost to the estate. *Held*, that the administrator was properly surcharged with the loss.

*Administrator's commissions—Surcharge—Management of estate.*

In the above case, apart from the loss on the iron lease, the administrator managed the rest of the estate with such skill as to largely increase the value of the assets. He spent a large amount of time and labor upon the estate, and was compelled to enter security in a large sum. *Held*, that he was entitled to his commissions.

Argued Nov. 12, 1894.   Appeals, No. 323, Oct. T., 1894, and No. 19, Oct. T., 1895, by the administrator and a creditor, from the decree of O. C. Allegheny Co., June T., 1894, No. 73, on exceptions to adjudication.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Affirmed.

Exceptions to adjudication.

The facts were stated as follows by HAWKINS, P. J.:

" The principal question involved in this case grows out of expenditures made by the administrator on account of a certain leasehold located in the state of New York.   The material facts are these:

" Mr. Shinn died May 5, 1892, leaving as his next of kin, Joseph A. and John K. Shinn.   The assets in Pennsylvania consisted of personalty amounting to $136,126.92, and realty estimated at $75,000 (but which was afterward sold for $64,000), making a total of $211,126,92; and liabilities amounting to $202,648.27.

" Besides these assets, Mr. Shinn, shortly before his death, secured the leasehold already mentioned at an annual rental value of $5,000 and royalties; the purpose of which was to mine, and by means of a process not in common use and largely experimental, to separate the ore supposed to be deposited in the leased lands.   At the time of his death Mr. Shinn had accordingly erected suitable buildings and machinery and made extensive strippings of the surface at an expenditure of about $100,000, and was ready to begin operations.   The leasehold, besides rental and royalties, was subject to a chattel mortgage and other charges amounting to about $40,000.

" No letters were taken out in New York, but the Messrs. Shinn, next of kin, on behalf of present accountant, undertook the management and disposition of the property with the idea that the estate was entirely solvent.   They became satisfied from personal examination and from inquiry made of the superintendent, the superintendent's father, who had control of a similar mine, and Mr. Huxley, president of the Sturtevant Mill Company, a chattel mortgage creditor, that the leasehold was worth the amount invested.   Mr. Huxley was at first very enthusiastic over the prospect as to the success of it, if it was worked,

and recommended very strongly that further development be made of the body of the ore, for the reason that the rich ore had not been reached.  He particularly claimed that if the work was stopped it would have the appearance of being a failure, and would depreciate the value of the property; that it was necessary to show the rich iron ore, and the quality that was expected to be used as a mercantile ore.  A shaft was accordingly sunk, and the result was so favorable that Mr. Huxley expressed a desire to buy.  Accordingly in July, 1892, the property was offered to him at cost, but his enthusiasm seems to have in the meantime somewhat cooled.  He would buy, but not at that price; for the location of the mill was probably not as he would have located it and necessitated the erection of heavier foundations, but he would consider the matter and write in a few days; no letter was received, and a month later Mr. Shinn, having found him in New York, was told that he had not agreed to purchase it, but would interest some of his friends in the property and go in with them.  A month later, in September, he said he would be willing to take it at $50,000; but when it was offered to him at that price he again evaded.  No further or other offer was made.  In the meantime this accountant paid out of the fund belonging to the administrator of this estate, on account of the claim of the Sturtevant Mill Company, of which Mr. Huxley was president, $23,375.42.  He had also paid out of the same fund $7,066.24 for shafting, although the same purpose could have been secured at a cost of less than five hundred dollars; rent $6,394.53; and other similar expenses.  The whole amount thus expended was $44,736.36.  The leasehold property has since been sold by adverse legal proceedings, and nothing realized to the estate therefrom.

" The administrator does not seem to have consulted any attorney of this state with reference to the leasehold, but to have acted under the advice of Judge Hawes, of New York.  None of the creditors who are exceptants to this branch of the administration appear to have been consulted, or had any knowledge of the transaction, although some of them are resident here and some in New York.  They object to the allowance of the credits claimed on this account as being illegal."

The court surcharged the accountant for expenditures made by him upon the leasehold of the iron mine in New York

The accountant was allowed commissions at the rate of five per cent on $139,859.

*Error assigned* by the administrator was decree surcharging him.

*Error assigned* by Trenton Iron Co., was allowance of commissions.

*Willis F. McCook*, for appellant, cited, on question of surcharge: Wms. Exrs. § 680; Shakespeare v. Fidelity Title & Safe Deposit Co., 97 Pa. 173; McCullough v. Young, 1 Binn. 63; Potter v. Hitchcock, 30 Conn. 408; 19 A. & E. Ency. L. 109; Magraw v. Irwin, 87 Pa. 139.

On question of commissions: Eshleman's & Gyger's Ap., 74 Pa. 42; Rockafield's Est., 4 Lanc. 113; Davis' Ap., 100 Pa. 201; Harbster's Ap., 125 Pa. 1.

*James Balph, R. A. Balph, A. M. Brown, John S. Lambie* and *J. E. McKelvy* with him, for creditors, cited, on question of surcharge: Act of March 15, 1832, P. L. 136; Magraw v. Irwin, 87 Pa. 139; Story's Conflict of Law, sec. 14; Mothland v. Wireman, 3 P. & W. 185; Freeman's Ap., 68 Pa. 151; Dent's Ap., 22 Pa. 514.

*John S. Lambie, A. M. Brown* and *John Sparhawk, Jr.*, with him, for the Trenton Iron Co., cited, on question of commissions: Snyder's Ap., 54 Pa. 67; Pusey v. Clemson, 9 S. & R. 204; Heckert's Ap., 24 Pa. 482; McCahan's Ap., 7 Pa. 56; Stehman's Ap., 5 Pa. 413; Norris's Ap., 71 Pa. 106; Wistar's Ap., 54 Pa. 60; Stevenson's Est., 4 Whart. 98; Stewart's Ap., 110 Pa. 410; Landis v. Scott, 32 Pa. 495; Gilson's Est., 18 W. N. 570.

SHINN'S APPEAL.

OPINION BY MR. JUSTICE DEAN, Jan. 7, 1895:

William P. Shinn died intestate May 5, 1892, leaving as his next of kin, Joseph A. and John K. Shinn. The assets, real and personal, in Pennsylvania amounted to $211,126.92, and debts, $202,648.27. Before his death, he had taken the leasehold interest of a tract of iron ore land in Westchester county,

New York, granting the right for twenty years to mine and remove the iron ore therefrom at a price or royalty of fifty cents per ton, and fixing a minimum production of not less than ten thousand tons, or $5,000 per year. William P. Shinn, in his lifetime, had expended more than $100,000 in improvements and patents for the production and preparation of the ore for furnaces. Besides the royalties and certain rentals stipulated to be paid, there was upon the leasehold a chattel mortgage and other charges amounting to about $40,000. To make this operation a success, the administrator took from the general fund, $44,736.36 and expended it in patents, test or exploring shafts, and for other purposes in and about the ore lease, and claimed credit therefor in his account. The auditing judge surcharged him with these expenditures, and the administrator appeals.

We are not disposed to affirm this decree on the opinion of the learned judge of the court below. In that opinion, the surcharge is sustained for two reasons; the first and controlling one, because the accountant had no authority to go beyond the limits of the state, and attempt to manage a part of the estate in a foreign jurisdiction, and to that end, appropriate a part of the assets realized in the state of the domicile. As to this, the court says: "The action of the accountant was therefore clearly a breach of official duty."

Neither the facts in this case, nor the law applicable to them, warrants such a sweeping conclusion. The question raised here, is not being tried in the courts of New York, with adverse claimants of that state against the right of the administrator to remove the assets to another jurisdiction. Nor is it being tried in the courts of this state, with home creditors contesting the right of a New York administrator to remove the fund beyond the reach of our court. In either case, the legal title of the administrator, and his intermeddling with the fund, might be effectually denied. But the question here is, what may an administrator do with reference to personal assets beyond the jurisdiction, without subjecting himself to the peril of a surcharge? It is answered that he should have immediately converted the asset into money and for that purpose should have raised an ancillary administrator within the jurisdiction of the New York courts, whose duty it would have been to sell and distribute the fund, first, to the creditors there, and then pay

over to him the balance for distribution among the general creditors in Pennsylvania.   But suppose an immediate sale would have been impossible or unwise, and that the expenditure of a limited amount would have made the asset marketable at a fair price, and thus have saved a large sum for the estate? If it had been reasonably probable, as appellant claims, that the expenditure of about $7,000 in completing a shaft would have made the property worth in the market at least $75,000, and thus have saved the larger part of the more than $100,000 already expended upon it, certainly a court of equity would not have surcharged such a trustee with the $7,000, merely because the money had come out of the general fund, and had been paid outside the state.   Even an executor de son tort is entitled to reimbursement for payments properly made in relief of the estate.   It is argued, an ancillary administrator should have been appointed to do this.   If he had been first appointed, he would have had no money to expend, unless he received it from the Pennsylvania administrator, and the same fund would have been depleted for the same purpose.  When an administrator assumes the office, and has delivered to him assets of the character of these, the exigency may require that he, within a limited extent, shall act beyond the jurisdiction.   The intestate here had pledged, in New York banks, collateral, largely exceeding in value the amount of the obligations for which they were pledged; the administrator paid off the obligations out of the general fund, lifted the collateral, sold it, and thereby swelled the general fund.   No one of the creditors claims that he be surcharged with the amount paid on the notes, because the money to pay them was taken from the general fund, and paid outside the jurisdiction.   If he had paid no attention to the matter, and permitted the collateral to be sacrificed, the creditors could properly have claimed a surcharge because of neglect of a plain duty.   This leasehold was a chattel in New York state, and is so treated there, and a chattel mortgage under the laws of that state given upon it.   The administrator finds the instrument among the other personal assets of his intestate.   To decide that the mere fact that he expended money beyond the state to save valuable assets, warrants a surcharge, is carrying the doctrine, which confines the administration of assets to the jurisdiction of the domicile, too far, and beyond anything ever intended to be decided by this court.

As early as 1803 it was decided in McCullough v. Young, 1 Binn. 63, that it had "been uniformly understood, both before and since the revolution, that letters of administration granted in a sister state are a sufficient authority to maintain an action here; and such has been the practice without regard to the particular intestate laws of the state where they have been granted. There may be, indeed, great inconveniences from the law, but it lies within the legislature to remedy them." This case was virtually overruled in Brodie v. Bickley, 2 Rawle, 431, decided in 1830, in which it was held that an action would not lie against an administrator in this state on a judgment obtained against another administrator of the same estate, in another state. The court says: "The authority of an administrator under letters granted in a sister state to meddle with the assets here, is an anomaly produced by an unexampled spirit of comity in the courts of this state, which will probably be attended in this respect with perplexity and confusion." This was followed by Mothland v. Wireman, 3 P. & W. 185, decided in 1831. The real question for decision in this case was whether Wireman, an administrator in Pennsylvania, was chargeable with assets received by his co-administrator, who was both a resident of Maryland and surviving partner of decedent in certain iron works in that state, and by reason of his survivorship had received money belonging to the estate. This court held the Pennsylvania administrator was not liable except for assets received within the jurisdiction, although the bond was joint. That the money received from the iron property by the surviving partner and co-administrator must be accounted for in the courts of Maryland. The decision is grounded on Brodie v. Bickley, supra, decided the year before. It is true, GIBSON, C. J., in delivering the opinion, says he is unable to see why, if even the assets in Maryland had come into the hands of the administrator in Pennsylvania, the latter should be charged with them; but this was wholly outside the case, for there was no pretence that the Pennsylvania administrator had actually received any part of the fund. The decision is good law for just what is decided, that the Pennsylvania administrator was not liable for the fund received by his co-administrator, a resident of Maryland, on assets located in Maryland. The court again speaks in deprecatory terms of

that "injudicious spirit of comity" which prevailed in the courts of this state, evidently having in mind the decision in McCullough v. Young, supra.

Then, apparently moved by these criticisms, the legislature passed the act of March 15, 1832, in which it is enacted that: "No letters testamentary, or of administration or otherwise, purporting to authorize any persons to intermeddle with the estate of a decedent, which may be granted out of this commonwealth, shall confer on such person any of the powers and authority possessed by an executor or administrator under the letters granted within this state." This was a severe blow to the doctrine of comity on which McCullough v. Young was based, and which GIBSON, C. J., in the subsequent cases thought insufficient to warrant the decision. .

But this act was found inconveniently rigorous, so it was amended by that of June 16, 1836, enacting that it should not apply to shares of stock in any incorporated company within this state; and then again by act of 15th of May, 1850, that it should not apply to any loan of any incorporated company within this state. So that, in a spirit of comity, a foreign administrator could come into this state and manage and collect such assets without having ancillary letters issued.

A number of cases arose requiring an interpretation of the act.   Dent's Appeal, 22 Pa. 514, held that although distribution of foreign assets must be made according to the law of the domicile, it was not required that such distribution should be made in the place of the domicile; that this was a question, not of jurisdiction, but discretion.   In Moore v. Fields, 42 Pa. 467, it was decided, that where a debt against an administrator of an estate in New York had been settled by final decree of the surrogate court, an action would lie against the administrator in this state by the public administrator of New York, without the issue of ancillary letters in this state.   In Shakespeare v. Deposit Co., 97 Pa. 173, it was held that United States bonds on special deposit could be sued for by a foreign administrator in the courts of this state.   In Musselman's Appeal, 101 Pa. 165, it was decided that letters testamentary to a Pennsylvania citizen, upon the estate of a resident of another state, gave no jurisdiction to Pennsylvania courts over the accounts.   Lines v. Lines, 142 Pa. 149, held that a court of equity in this state

had no jurisdiction over the personal property of a decedent of another state which would authorize it to take such property out of the hands of those in possession.

But in no case has it been decided that the mere fact of an administrator expending money in any reasonable effort to save the property of his intestate situated in another state, is sufficient to convict him of a devastavit. As is said by Justice SHARSWOOD in Shakespeare v. Fidelity Company, supra, "the point has never been decided in this state."

A voluntary payment by a debtor of this state to a foreign administrator, when no ancillary letters had previously issued, would not be that offensive " intermeddling " with the assets in this state, as would make it a mispayment under our statute; and we will not assume, that, in a spirit of comity, the mere payments by this administrator beyond the jurisdiction, from that fact alone, should be declared unlawful.

Nor will we assume that if he had sold the property and had paid the claims upon it, he would not be answerable in this state for the surplus. The argument to the contrary has nothing to support it but the dictum in Mothland v. Wireman, supra, and is not in accord with any of the adjudicated cases. The ruling in Wilkins v. Ellet, 9 Wall. 740, is sounder in principle : "The foreign administrator's title is recognized to receive a voluntary payment and to give a valid acquittance therefor, provided no ancillary letters have been previously granted. The payment being voluntary, the executor has not intermeddled." In Potter v. Hitchcock, 30 Conn. 408, a guardian had among his ward's assets the note of a citizen of another state. He made no effort to collect because the debtor was not within the jurisdiction. The court surcharged him with it, saying, with persuasive reason, that the domiciliary guardian was bound to use reasonable care and diligence in endeavors to save his ward's estate. To hold that the representative of the personal estate within the domicile owes no duty whatever either to creditors or next of kin, with reference to personalty outside the jurisdiction, is to invite neglect and consequent waste and dissipation of assets. That he has no standing as a suitor in a foreign jurisdiction does not alone fix the measure of his duty nor has it ever been so regarded in practice. In thus holding, we do not intimate that he must go into a foreign jurisdiction and

institute suits which could not be sustained, or offensively intermeddle with assets, so as to defy or disregard the jurisdiction of the courts of the situs.   There are often many things he may do, many things he ought to do, which suggest themselves to the prudent business man, tending towards the preservation of the estate, and are neither obnoxious to the law nor antagonistic to the interests of foreign creditors.

But while we do not sustain the decree of the learned judge of the court below on his first reason, we think it fairly supported by the second.   On the facts found, the action of the administrator was wholly unwarranted.   The iron ore operation was a speculative venture which the decedent, in his lifetime, had a perfect right to enter upon ; his business was to accumulate an estate ; if his ventures turned out successful, he reaped the profits ; if unsuccessful, no others were interested or had a right to complain.   But the business of this administrator was not to make money for the estate by hazardous ventures, but to save that which came into his hands, for creditors and kin, by prudent business management.   Speculative ventures were not prudent business management.   The ore was uncertain, both as to quantity and quality, as is apparent on a mere reading of the stipulations in the lease ; the cost of production was not known with even approximate certainty, for the methods of mining and cleaning were purely experimental. Besides these risks, the value of the ore when ready for the furnace was wholly uncertain, because it was certain to be subject to the wide fluctuations of the iron market.   Without consultation with the creditors, with no cautionary order from the court on a statement of the facts, he put into this plant, in hopes of profit, this large sum of money—money realized from the estate in Pennsylvania.   The business proved a most disastrous failure.   The whole was sold under legal proceedings in New York and did not bring the amount of claims against it.   He advised with no one, as to the judiciousness of expending this $45,000 of the creditors' money, except those whose interests were, in a certain sense, antagonistic to the creditors. His New York advisers were interested in keeping the plant in operation whether it made money or lost.   Joseph A. and John K. Shinn, next of kin, examined the property, and they advised him to continue it in operation.   It was their interest

to do so.   They doubtless knew, as did the administrator, that unless at least a portion of the large amount invested in this operation by decedent, in his lifetime, was saved, the estate was practically insolvent.   If it proved successful, there would be a surplus to go to them, the next of kin; if unsuccessful, they were no worse off, as the loss would fall upon the creditors. Yet the administrator took the creditors' money and invested it in a wild speculation.   He might, almost as safely, have invested it in stocks on the prospect of a rise.   This was not ordinary business sagacity or prudent management.   His conduct, on the facts found by the auditing judge, therefore, warranted the surcharge.

The decree is affirmed and the appeal is dismissed at costs of appellant.

### TRENTON IRON CO'S APPEAL.

OPINION BY MR. JUSTICE DEAN, Jan. 7, 1895:

The facts in this case, are about the same as in the appeal of William H. Shinn, administrator, opinion filed this day.   The appeal here, however, is from that part of the decree which allows the administrator commissions.

The court, although surcharging the administrator with a large sum of money expended on an iron ore operation in New York, nevertheless finds that he acted in good faith, and allows him his commissions.   We are not inclined, on the facts, to disturb this decree.   The appellee was compelled to give very heavy bonds, covering nearly $200,000 worth of property, for which he paid to the surety companies $500.   For this, the court allowed him no credit.   While we saw much to condemn in his conduct with reference to the New York property, we see nothing but diligent, astute business management of the Pennsylvania property.   With no cash on hand, except about $1,500, he saved from peril $103,000 of stocks pledged by the decedent for small loans, both within and without the state; these he then sold for about $21,000 more than they were appraised at; more than twice as much as they would have sold for at any time since.   The appellant claims, that it was through the aid of reputable bankers he accomplished this · let that be so; a trustee who has the sagacity to select efficient aids in the management of delicate and responsible interests intrusted to him, is all the more deserving of remuneration, especially as the

bankers charged for their services less that $400. Besides these stocks he performed most vexatious labor in the sale and management of the real estate, which was heavily mortgaged, and realized on that, $64,500, an amount considerably in excess of the liens. His commissions, as allowed, amount to about $7,000. The court below did not think, in view of the actual services and time devoted to his duties, and the large responsibilities involved, that this was unreasonable. We are not convinced there was any error in the allowance.

The decree is affirmed, and the appeal is dismissed at costs of appellant.