ELEANOR COOK GOLDSBOROUGH, ET AL *v.*
EDWARD DE WITT, ET AL., EXECUTORS.
[No. 50, October Term, 1935.]

*Decided January 15th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Isaac Lobe Straus* and *Harrison Tilghman*, with whom was *Madison Brown* on the brief, for the appellants.

*William H. Adkins* and *Vernon Cook*, with whom was *Daniel M. Henry* on the brief, for the appellees.

JOHNSON, J., delivered the opinion of the Court.

This is an appeal from an order of the Orphans' Court of Talbot County, passed on June 19th, 1935, refusing to grant appellants' petition for plenary proceedings and the transmission of issues to a court of law for trial by a jury.

Charles Shirley Goldsborough died June 23rd, 1930, leaving a last will and testament, in which Edward De Witt and Stephen J. McGarrigle, of New York City, were named as executors. This will was promptly admitted to

probate and the executors duly qualified. By the terms of the will the bulk of his estate was left in trust to the Bank of New York & Trust Company, with directions to pay, in certain proportions, the income therefrom to his widow, Eleanor Cook Goldsborough, his two sisters, his brother, and a sister-in-law, with certain cross-remainders among them and their descendents. The widow, the brother, sisters, and sister-in-law are appellants herein. On November 12th, following his demise, the widow filed her renunciation and thereby elected to take, in lieu of the provision made for her in her husband's will, her legal share of his entire estate. The personal estate at that time was inventoried and valued as follows: Stocks in excess of $550,000 in the hands of testator's New York brokers, in whose favor a lien existed thereon for $228,000; cash in banks of about $13,000; a dairy farm in Talbot county, $35,000; a herd of dairy cattle on the above farm with livestock, machinery, and equipment used in its operation, approximately $9,000.

For a better understanding of the questions raised by the appeal, items 1, 6, 7, and 11 are quoted from the will as follows:

"First: I order and direct my executors hereinafter named to pay all my just debts and funeral expenses as soon as practicable after my decease. * * * "

"Sixth: I hereby authorize and empower my executors hereinafter named and the survivors or survivor of them or such of them as shall qualify and undertake the execution of this my will in their discretion to sell and dispose of the whole or any part of my real estate not hereinbefore specifically devised at such time or times and in such manner either at public auction or by private sale and for such price and upon such terms as they shall deem proper and to execute and deliver good and sufficient deeds of conveyance therefor to the purchaser or purchasers thereof and until the sale thereof to let and lease the same for such time and upon such terms and conditions and for such rent as my said executors shall deem advisable. * * * "

"Seventh: I hereby authorize and empower my executors and trustees or such of them as shall qualify and undertake the execution of this my will to retain and set apart any stocks, bonds, mortgages or other securities or investments which I may hold at the time of my decease for the purpose of the trusts created by this my will or in their discretion to sell and dispose of the same and reinvest the proceeds thereof in such securities as shall then be authorized as trust investments by the laws of the State of New York. * * *."

"Eleventh: I hereby nominate, constitute and appoint my friends Edward DeWitt and Stephen J. McGarrigle who are now members of the firm of DeWitt, Lockman & DeWitt having their office at No. 88 Nassau Street in the Borough of Manhattan City of New York executors of this my will and it is my will and I direct that no bond or other security shall be required by any surrogate probate court or judge of any court of or from my executors and my trustee hereinbefore named in this my will for the faithful performance of their or its duties under this my will or on account of the non-residence of such executor and trustee. * * * "

Shortly after their qualification, the prices of agricultural products, as well as dairy cattle, had so materially declined, the executors felt it against the best interests of the estate either to sell the farm or the dairy, stock, and equipment at that time, and that, while keeping the cattle and the farm, it was best to operate the latter in order to feed the former. At the same time the water supply upon the farm had become exhausted, and water for the herd was being hauled from Easton. These matters were brought to the attention of the orphans' court by petition, with the result that the executors were authorized to continue farm operations and to sink an artesian well upon the farm; the cost of the latter to be borne by the principal of the estate.

The court, upon petition of the executors filed October 21st, 1930, authorized them to sell for not less than their appraised value, publicly or privately, such stocks be-

longing to the estate as might be deemed advisable. However, stocks had begun to decline in prices and the executors were never able to sell any of them at their appraised value. The record discloses eight specific instances between October 21st, 1930, and April 16th, 1935 (the date upon which the sale of the remainder of the stocks was reported), in which the court was fully informed by petitions of the executors as to the steady decline in the market values of these securities. In many of the petitions it was suggested that to dispose of the stocks at then prevailing prices would mean a great sacrifice to the estate, but in each of these instances the situation was fairly and impartially placed before the court. In some cases, upon the petition of the executors, the court authorized the sale of a part of the stocks at prices then prevailing, in order to bring about a reduction of the indebtedness upon them, thus, as it was thought, preventing a sacrifice of all these issues. Likewise from August 18th, 1931, to February 26th, 1935, nine petitions were presented and considered by the court, in which, because of the low prices of these stocks and consequent loss to the estate by then disposing of them, the court, upon each of these, ordered a six months' extension of time in which to close the estate. It is thus undisputed that, throughout the period of administration, the executors kept the court informed as to their activities, and sought its guidance in all matters; the result being that the remaining stocks in the hands of the executors were not disposed of until March 29th, 1935.

Among the stocks belonging to the estate was an item of 1,000 shares of preferred and 500 shares common of the "Passwall Corporation," which after the death of the testator was amended to read "Eastern Shares Corporation." Equity Corporation, an investment trust organization, had offered to exchange its stock for that of the Eastern Shares Corporation held by the executors, by which it was first understood that the Goldsborough estate would receive 1,850 shares preferred and 2,500 shares common of its stock. The executors, believing

such an exchange would be to the advantage of the estate, brought the matter to the attention of the orphans' court, and received its authority to make the exchange. It was later discovered, however, that by the offer of exchange the Goldsborough estate was to receive only 850 shares of Equity Corporation $3 preferred stock and 2,500 shares of its common stock, and upon petition of the executors the court amended its previous order to cover the terms of the exchange.

On June 21st, 1934, the executors filed their first account, which covered the period from the date of testator's death to June 7th, 1934. Their second account, filed on November 19th, 1934, covered the period from June 7th to November 1st of the same year, and the third, filed on May 21st, 1935, covered the period from November 1st, 1934, to April 24th, 1935, and, at the time of filing this, they also filed a fourth account, which was a consolidation of all preceding accounts. From these it was revealed that the estate sustained a loss, resulting from depreciation on stocks, between the date of their appraisal and their final sale, of $295,889.47 (which included the loss sustained by exchange of Eastern Shares Corporation stock), while a loss had been sustained amounting to $1,104.90 upon the dairy herd and farming implements; this being the difference between their appraised value shortly after testator's death and the amount finally received for them. There was also a net loss to the estate from farm operations amounting to $10,396.02, which sum was apparently made good from income from stocks and securities that came into the hands of the executors.

During the course of the farm operations, one of the executors advanced to the estate from his individual funds an amount in excess of $1,500, which was used to meet certain farm expenses.

At the time of the testator's death he was indebted to the Talbot Bank of Easton on a promissory note of $700; also he owed a mortgage upon the farm for $4,000. The final account showed that the note, with interest, was paid on July 31st, 1931, and the mortgage, with interest

of $1,117.64, was paid on March 14th, 1935, at which time the title to the farm was transferred to the purchaser.

At no time have any of the appellants, although familiar with the fact that the administration of the estate was protracted, appealed from any of the orders of the Orphans' Court of Talbot County which specifically authorized executors to defer selling the stocks, securities, dairy herd, or equipment, nor from any other orders passed pertaining to the personal estate; neither did they object thereto. Moreover, they have not at any time challenged the truth of any reports made by the executors concerning the estate, whether in the form of petitions or accounts. And even at this time there is not the slightest charge of any fraudulent conduct on the part of the executors.

In the third administration account, the executors claimed an allowance for maximum commissions provided by law upon the gross amount of the estate, less deductions for depreciation in securities, dairy herd, farm equipment, and additional personalty belonging to the estate, plus certain advances made by one of the executors, and advances made to the brokers holding the securities.

Shortly after the filing of the third and fourth accounts, appellants filed exceptions thereto, and, exactly one day before the date fixed for a hearing thereon, they filed in the same court their petition for issues, in which, among other things, they referred specifically to the length of time consumed by the executors in the settlement of the estate, with resultant losses hereinbefore set forth, both upon stocks as well as farm operations, dairy herd, and farming implements, and mentioned specifically the items of interest paid upon the $700 note and $4,000 mortgage, it being alleged that these principal items should have been paid promptly out of cash left by decedent, instead of allowing interest to accumulate thereon; and that the transfer of the Passwall Corporation stock was in violation of the

terms of the will. And in addition to such specific charges it was charged generally that all the losses in question were due to the illegal conduct of the executors or their disregard of and failure to act in accordance with the terms of decedent's will; that by reason of the matters so alleged, certain controversies of fact had arisen for appropriate adjudication, and it was proper for the court to direct plenary proceedings requiring the executors to answer the petition and thereupon direct that issues of fact be made up respecting said controversies and sent to a court of law for trial, the same to be in substance as follows:

"Was the loss from the depreciation of the stocks and securities mentioned in the eighth paragraph of this petition caused by the negligence of the executors; or by their violation of the terms of the last will and testament of said Charles Shirley Goldsborough; or by their violation of their duty to sell the said stocks and securities and apply the proceeds to the trust estates where trusts are created by the will, and to the payment of the absolute estates provided for by law, and to the payment of absolute legacies bequeathed by said last will and testatment; or by the failure of said executors to close said estate and distribute the same in accordance with the will and with the law, within the reasonable time prescribed and required by the law?

"Was the loss referred to in the ninth paragraph of this petition, resulting from the operation by said executors of the said farms Sunnyside and Traveler's Rest, caused by the failure of said executors to let and lease said farms from the time letters testamentary were issued to them until they sold said farms?

"Was the said loss resulting from the operation of said farms by said executors caused by their failure to obey the provisions of said last will and testament to let and lease the said farms?

"Was the loss arising from the expenditure by said executors of said sum of $27,776.11 in the operation and conduct of said farms caused by the failure of said execu-

tors to obey the direction of said last will and testament to let and lease the said farms until the same might be sold?

"Was the loss resulting from the transfer of said sum of $10,396.02, referred to in the tenth paragraph of this petition from the income accruing from said stocks and securities, caused by the failure of said executors to obey the provisions of said last will and testament with respect to the application of the income accruing from said stocks and securities and from their violation of said provisions?

"Was the loss of the sum of $1,104.90 referred to in the eleventh paragraph of said petition caused by the failure of said executors properly to sell the personal property and equipment on said farm, or preserve and dispose of the same for the benefit of said estate?

"Were the losses resulting from the payment by said executors of the two items of interest on debts of the testator mentioned in paragraph 12 of this petition, to wit, $55.18 upon the note of $700.00 due by the testator at the time of his death, and $1,117.67 upon the mortgage of $4,000.00 due by said testator and resting upon one of his farms at the time of his death, caused by failure and neglect of said executors to pay said item of interest during the period of one year after the death of said testator?

"Were the shares of preferred stock and the shares of common stock of Equity Corporation, which the said executors received and accepted in exchange for the shares of the stock of Eastern Corporation, referred to in the thirteen paragraph of this petition, securities authorized as and for trust investments by the laws of the state of New York, and whether in accepting and receiving said shares of stock of said Equity Corporation in said exchange the said executors disobeyed and violated the direction and requirement of said last will and testament that investments in securities should be in securities authorized as trust investments by the laws of the state of New York?

"Whether the administration upon the part of said executors of said estate of said Charles Shirley Goldsborough from the time they received their letters testamentary as executors on August 5, 1930, to the present time, injured and sacrificed the property and interests of said estate and resulted in large losses, injury and damage to said estate?

"Whether the said executors in keeping open and carrying on for a period of nearly five years following the granting of letters testamentary to said executors, a speculative account in stocks and securities, carried upon margin with the firm of New York brokers known as Pask & Walbridge, and in leaving said stocks and securities, consisting of the major and substantial part of said testator's estate, in said speculative account at the hazard, risk and peril, attending such speculative accounts, in the New York stock market, were grossly negligent, and violated the express direction and mandate of said testator's last will and testament, resulting in large losses to said estate and to the parties beneficially interested therein?"

The petition concluded with a prayer that the executors be required to answer it and the matters set forth therein, and that issues of fact raised by it, and their answer to be filed thereto, might be framed by the court and transmitted to a court of law for trial by a jury; that in the meantime the court defer action upon the administration account. Appellees promptly filed a paper in the nature of a motion *ne recipiatur* to the petition, and assigned as reasons therefor, (a) that it showed on its face this was not a proper case for issues, and (b) that it appeared from the proceedings of record in the cause that the acts of the executors against which complaint was made were all done under the jurisdiction and orders of the court which were thereby referred to. The court thereupon sustained the contention of appellees and passed its order dismissing the petition, from which this appeal is taken.

The question, then, before us, is whether or not, under

all the facts appearing in the record, appellants were entitled to such issues. At the outset it should be borne in mind that, notwithstanding the language of sections 263 and 264 of article 93 of the Code, issues are not proper in any case before the orphans' court, except as ancillary to some relief in a matter over which the tribunal has jurisdiction to decide. Thus in a caveat to a will, an issue as to the sanity, *vel non*, of the testator at the time of its execution is proper, and, regardless of the answer, the court has something definite upon which it can act, either by sustaining or striking down the instrument. Moreover, such issues must be of such nature as to present for answer by the jury facts in controversy between the parties, which, when answered, are binding upon the court. *Sumwalt v. Sumwalt*, 52 Md. 388; *Brewer v. Barrett*, 58 Md. 587, 591; *Taylor v. Nuttle*, 62 Md. 342; *Ward v. Poor*, 94 Md. 133, 142, 50 A. 572; *Pleasants v. McKenney*, 109 Md. 277, 71 A. 955; *Schmidt v. Johnston*, 154 Md. 125, 133, 140 A. 87; *Fowler v. Brady*, 110 Md. 204, 73 A. 15.

Applying this rule to the issues presented, it is apparent that in many instances it is violated, for the reason that the issues submit questions of law, or submit questions which the court itself is without jurisdiction to entertain, and if, for the sake or argument, it be conceded that some of them do not offend the rule, these present questions of fact to be answered by a jury when the court itself, as appears from the record, has previously in effect decided them by passing orders directing the executors to defer the sales in the hope of a better market. True, their judgment, in the light of subsequent events, was not good or advantageous to the estate, but since there is no question of the good faith on the part of the court or the executors in the passage of these orders, of what value would be the answers to such issues? The jurisdiction of the orphans' courts is special and limited, but there is conferred upon them the authority to superintend and direct the settlement and distribution of estates (Code, art. 93, sec. 243), which necessarily involves pass-

ing upon administrative matters of such estates. It therefore cannot be doubted that in this case the court had authority to pass the orders which appear in the record, and it is equally true that, having exercised such authority, which has not been challenged by appeal or otherwise, it cannot be attacked by sending issues to a court of law to be answered by a jury, as is here proposed. Moreover, it is to be observed that if all of these issues were sent to a court of law and answered by a jury in favor of the contention of appellants, the orphans' court, either by reason of its previous orders in the premises, or its lack of statutory power, would be without jurisdiction to pass orders upon such answers when certified, all of which further demonstrates that the issues presented were improper.

It appearing, therefore, that the remedy of appellants, if any, cannot be pursued in this manner, the order appealed from must be affirmed.

> *Order affirmed, with costs to be paid by appellants.*