ELEANOR COOK GOLDSBOROUGH *v.* EDWARD DE WITT, ET AL., EXECUTORS.
MARY HILL GOLDSBOROUGH, ET AL., *v.* EDWARD DE WITT, ET AL., EXECUTORS.
ELEANOR COOK GOLDSBOROUGH *v.* EDWARD DE WITT, ET AL., EXECUTORS.

[Nos. 37-39, October Term, 1936.]

228

*Decided January 12th, 1937.*

The causes were argued before BOND, C.J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, and JOHNSON, JJ.

*Harrison Tilghman* and *Isaac Lobe Straus,* with whom were *James E. Ingram, Jr., William D. Macmillan, Madison Brown,* and *Isidor Roman* on the briefs, for the appellants.

*William H. Adkins* and *Vernon Cook,* with whom were *Charles McH. Howard* and *Daniel M. Henry* on the briefs, for the appellees.

PARKE, J., delivered the opinion of the Court.

Charles Shirley Goldsborough, of Talbot County, died testate on July 23rd, 1930. He named his legal advisers and friends, Edward De Witt and Stephen J. McGarrigle, two attorneys at law of New York City, his executors, and stated that they were not to be required to give bond. The will was admitted to probate, and the executors qualified by executing separate bonds for the payment of the debts, taxes, and assessments due by the deceased, and tax on commissions, as was made necessary by the statutory law of Maryland. Code, art. 93, sec. 42; art. 81, secs. 101, 102, 103, Supp. 1935 (sections 119-121, old); *State v. Talbott,* 148 Md. 70, 79, 128 A. 908; *Neighbors v. Beck,* 162 Md. 362, 159 A. 748; *All v. McComas,* 162 Md. 690, 691, 161 A. 187.

The executors returned, on September 3rd, 1930, inventories and appraisements of the personal estate, and of the testator's farm "Traveler's Rest," for the purpose of the ascertainment of the collateral inheritance tax. The farm was appraised at $35,000, the tangible per-

sonalty at $8,946.60, and the securities at $552,719.25, which was their value as of the day the testator died. In addition, the cash on deposit was $13,197.21.

In the course of the administration of the estate a number of petitions were filed by the executors, and on them orders of court, which are now the subject of controversy, were passed. A statement of these orders will be made when later they come to be considered. In addition to these petitions, the executors filed on June 21st, 1934, a first report and account of their proceedings. A second report and supplemental account was filed on November 19th, 1934. On May 21st, 1935, a third report and account of their proceedings and an administration account were filed. An order *nisi* was passed on this fourth or administration account. The widow of the testator and certain of the beneficiaries under the will filed, on May 31st, 1935, exceptions to the ratification and passage of the account because the executors were not surcharged with the losses (1) in the alleged unlawful expense of a betterment and the operation of the farm until it was sold; and (2) in the sale of a motor boat at less than its appraised value; and, chiefly, (3) with the shrinkage in the value of the estate that was alleged to have been caused by the neglect of the executors in not promptly converting the stocks and other securities and goods and chattels of the estate into money and applying their proceeds and the money on hand to the debts of the testator; and (4) with loss alleged to have been incurred in the delay in sale and the unauthorized exchange of certain stock for other stock; and, finally, (5) because the executors had not been disallowed their commissions on account of these charged defaults in administration.

A few days after these exceptions had been filed, the four exceptants, with the addition of another beneficiary under the will, filed a petition which amplified the allegations of the former one, and asked for issues in respect of the responsibility of the executors for the decrease in value of the testator's estate for distribution.

The Orphans' Court rejected the application and dismissed the petition, and on appeal its order was affirmed in the case of *Eleanor Cook Goldsborough and Others v. Edward De Witt and Others,* 169 Md. 463, 182 A. 324.

The order which dismissed the petition for issues and its affirmance by this court was followed by the intervention of other beneficiaries under the will, and their adoption of the exceptions to the administration account which had been first filed. The cause then proceeded on the exceptions first filed, and much testimony was taken before the Orphans' Court, which, after argument, overruled the exceptions and confirmed the administration account as it had been stated, allowed commissions to the executors, the claim of the widow against the estate, with interest from the date the will was filed, and directed that the costs be paid out of the funds in the hands of the executors. The widow first appealed generally, and a few days later filed a second order for an appeal, which excluded from her appeal the allowance of her claim, with interest, against the estate, and the disposition of the costs. The beneficiaries under the will take their appeal from the entire order.

With the exception of objections to the ratification of the sale of the farm filed on October 23rd, 1934, by certain of the beneficiaries, no action of any kind was taken by any of the parties interested during the period from the grant of letters testamentary on August 5th, 1930, until May 31st, 1935, when exceptions were filed to the account of the executors which had been submitted on May 21st, 1935.

The record in the cause and the briefs of counsel have been closely read and considered. The record is so voluminous that anything more than a statement of the findings of the court on the issues of fact involved in the controversy would unduly and unnecessarily prolong the opinion, without serving any other purpose than displaying the operations of the judicial mind in reaching its conclusions by the application of familiar princples of evidence to conflicting testimony. So the court will state

the facts as it finds them from a weighing of all the relevant and material testimony, and base its decision upon the principles of law which it finds must control.

The provisions of the will will be first given. After directing the payment of his debts and funeral expenses as soon as practicable after his death, the testator gave his surviving wife, Eleanor Cook Goldsborough, all his household furniture and stores of every nature, the silver and plated ware and all works of art and articles of personal use, and, in addition, a lot of land in the village of Oxford. All the residue of his estate, both real and personal, he devised and bequeathed in fortieth parts.

Eighteen-fortieths of his residuary real and personal estate he gave to the Bank of New York & Trust Company, a body corporate, and its successors, in trust to receive the rents, issues, and profits of so much thereof as may be real estate and to invest and keep invested so much thereof as may be personal property, and to receive the income and interest arising therefrom, and to pay and apply the net rents, issues and profits, and income therefrom to the use and benefit of his wife, and from and after her death, or in the event that she should not survive the testator, to grant, assign, transfer, and pay over said eighteen-fortieths part of the residuary estate of real and personal property or the securities in which the same may be invested unto his named two sisters and brother, Mary Hill Goldsborough, Bena Turner Goldsborough, and John H. C. Goldsborough, in equal shares, with a provision for their issue to take in the event of the death of the three named.

Eight-fortieths of the residue were similarly devised and bequeathed to the same trustee and its successors in trust for the use of the testator's sister, Mary Hill Goldsborough, for life, and upon her death, or in the event she did not survive the testator, then the same were devised and bequeathed to the six named children of the life tenant, and, if any of these be dead, then over in the manner specified.

Five-fortieths of such residue were next in like man-

ner devised and bequeathed in trust for the use of the testator's sister, Bena Turner Goldsborough, for life, and upon her death, or should she not survive the testator, then the same was devised and bequeathed to the testator's brother and sister, Mary Hill Goldsborough, and John H. C. Goldsborough, in equal portions, or, if not then surviving, then to their respective issue *per stirpes*.

Four-fortieths of such residue were likewise devised and bequeathed in trust for the use of Frances Goldsborough, the widow of his dead brother, Matthew Tilghman Goldsborough, for life or until she remarry, and, in the event of her death or remarriage or should she not survive the testator, over unto Frances Goldsborough, a niece, and, if she be not living, then over as in the will provided.

The remaining five-fortieths were given, free of any trust, to the testator's brother, John H. C. Goldsborough. In the event the brother should not survive the testator, the share was devised and bequeathed unto his brother's issue, and, in default of such issue, then over to the testator's two sisters equally and their respective issue, if either be dead, *per stirpes*.

The testator conferred upon his executors the power, in their discretion, to sell and dispose of the whole or any part of his real estate that had not been specifically devised, at such time or times and in such manner either at public auction or private sale, and for such price and upon such terms, as they should deem proper, and until the sale thereof to let and lease the same for such time and upon such terms and conditions and for such rent as the executors might deem advisable.

He further authorized and empowered his executors and trustees to retain and set apart any stocks, bonds, mortgages, or other securities or investments which he might hold at the time of his death for the purpose of the trusts, or in their discretion to sell and dispose of the same and reinvest the proceeds thereof in such securities as shall be authorized as trust investments by the laws of the State of New York.

236

The widow renounced the will on November 12th, 1930. As the testator had died without leaving any descendants, she became entitled to one-half of his estate, and the interests of all the other beneficiaries under the will were greatly reduced by this election. The trustee named in the will never acquired possession of the trust estate, and on November 6th, 1935, filed a renunciation of the trusteeship. No successor appears to have been appointed.

The other pertinent facts will be stated in the separate consideration of the questions on this record.

1. Twenty days after the filing of the inventories and appraisements, the executors filed a petition for the passage of an order of the Orphans' Court that would authorize them to pay the expense incurred in the sinking of an artesian well on the farm of the testator, and to charge the amount to the principal of the estate. The petitioners further prayed that they might be granted leave to continue the operation of the farm out of income until a better season for sale would come. The reasons given were that the testator had maintained until his death a fully equipped and stocked farm. He had about sixty-nine head of valuable milk cows and other livestock. The conditions at the time of the testator's death had continued, and were unfavorable to a realization of the value of the stock and of the agricultural implements. Furthermore, there was no ready market for the land. The water had failed, and had to be hauled from a distance by truck for the stock. To remedy this costly and unsatisfactory method, a well was bored. On these representations, the Orphans' Court, on September 23rd, 1930, passed an *ex parte* order which ratified and confirmed what had been done, and directed their continuance on the ground that it would be to the advantage of all the parties in interest.

The language used by the testator indicates that the land was to be sold and the proceeds pass as part of his residuary estate. Until so sold, the rents and income therefrom were to be collected by his executors as part of the

residuary estate, as clearly appears from the express power of the executors to lease pending a sale by them. The land was in the hands of the executors for ultimate sale. It was obviously in the interest of the estate that the farm be operated until sold. The testator had not lived on the place, but employed a competent and satisfactory manager, whom the executors retained. They began at once their efforts to sell the farm. The property was listed with local and distant real estate agents, and was advertised as being for sale. The property was brought to the attention of real estate brokers in New York, Washington, Pittsburgh, Philadelphia, and other places. The first offer obtained was for $35,000, which the executors desired to accept, but the sale was not made because the widow, who, by virtue of her renunciation of the will, was the owner of an undivided one-half interest in the farm, would not agree to the sale at that price. The prospective purchaser withdrew the offer. Later offers were wholly inadequate. The executors, after inquiry and advice, came to the conclusion that, if they sold the stock and agricultural equipment and leased the farm, the practical effect would be to so lessen the farm's marketableness that it would be better to continue to farm at a moderate loss. The result was that, after farming at a gradually lessening loss, the widow finally consented to the sale of the farm for $25,000, and this sale was reported on August 22nd, 1934. An objection to its ratification by some of the beneficiaries was filed, and delayed the final ratification of the sale until December 19th, 1934. From the order of ratification an appeal was taken, but the appeal was dismissed on March 4th, 1935.

During the course of the running of the farm, the executors, by leave of the court first obtained, sold on several occasions unproductive live stock; and at the time of the sale of the farm, all the remaining live stock, farming equipment, poultry, and growing crops were sold to the buyers of the farm. As has been stated, the farming operations were conducted at an apparent loss, in that the yield was less than the expenses, and the

goods and chattels were sold for less than their appraised value. How much of the apparent loss was absorbed by the gain made in consequence of the greater purchase price procured as a result of the property having been maintained and not let run down, is not ascertainable, but it must have been substantial. The loss, however, is not attributable to any default on the part of the executors. On the record it would seem an incident of the conditions of their administration. The executors appear to have acted as any reasonable man would have done in his own affairs under similar adverse circumstances. They sought and took advice, and their judgment was that a loss in operation would be compensated by the better price to be obtained for a farm under cultivation, in good condition, and equipped and stocked for agriculture and dairy purposes, and ready to be immediately possessed by the purchaser. Acting under the authorization of the court, the farmer, who had been employed by the testator, was retained, and the farming was conducted under the supervision of the executors' local attorney, who was experienced in the care and management of farms in the same locality. The executors originally decided to continue the farming operations of the testator as a temporary expedient to conserve the value of the farm and its equipment. They did not contemplate the unforeseen developments which would so prolong the farming. Nor was this outcome to be attributed to any act on their part. They sought at once to make a sale. They procured, in August, 1932, a purchaser at a price which they believed it was their duty to accept. However, they could not convey the title to the farm, since the widow had renounced the will on November 12th, 1930, and had become entitled to an undivided one-half interest in the land. She declined to accept the amount offered, because she believed the property was worth much more than the proposed price. It was her declination and not the act of the executors which prevented this sale. After this opportunity was thus lost, the efforts of the executors were resumed, but the amounts procur-

able were inadequate, and so the farming was, with the knowledge of the parties in interest and without any objection on their part, but with what must be held to have been their acquiescence, continued by the executors until a sale was made with the widow's assent. The testimony is that meanwhile the executors had not received any offer of a lease, and that their judgment was that a renting of what had been a country estate of 391 acres would not have been advisable. In any event, there could not have been a demise without a tenant, and there is no testimony to the effect that the farm could have been let.

In authorizing or confirming the sinking of the artesian well, an immediate work of necessity, and the farming of the executors, before the renunciation by the widow, the Orphans' Court was passing orders within their jurisdiction, since the executors were administering the estate in that court and had been given a power to convert the realty by sale. After the renunciation, the scope of the orders were, with respect to the real estate, limited to the undivided one-half interest that was not the property of the widow. It is true the orders in question and now under consideration were *ex parte,* but the court here finds neither error of law nor improvidence of passage.

The contention, however, is advanced that the language of the will, which provided with reference to the realty that the executors, until their exercise of the power of sale, should have the power to let and lease the same for such time and upon such terms and conditions and for such rent as the executors should deem advisable, compelled the executors to lease the farm pending its sale. So, no matter how reasonable their actions, their failure to lease was a breach of the terms of the will which should surcharge the executors with the loss of their farming operations. The court can neither agree with this contention nor the conclusion. The fallacy rests upon the assumption that the grant of the administrative power of demise was intended to be a mandatory provision to demise to the exclusion of any duty of the executors to

manage the farm until sold or even until demised. It was clearly not the intention of the testator that the administrative power conferred upon the executors to sell land was to be limited or hampered by a peremptory command that a prior demise must necessarily be made or attempted during the period before a projected sale. The power to lease was bestowed to conserve the estate. The farm was stocked and equipped and was farmed by a manager. It was an estate which could only be kept in condition by cultivation and care. It is a reasonable inference that the testator did not desire an abandonment of its use and that the provision in the will conferring a power to lease was not a limitation upon the powers of the executors, but an indication of a testamentry purpose that the property should not be let go to waste, but be maintained. There is difficulty in escaping this conclusion when all the provisions of the will are read. Until the farm was sold, its maintenance and beneficial use were primary objects. It therefore may be said that the action of the executors in operating the farm for which they had no offer of a tenancy was within the contemplation of the testator. The executors had come into possession of the farm by virtue of their office under the will, and the evidence is plain that they acted, under the particular circumstances, reasonably, in good faith, according to their best judgment, and under the authorization of the Orphans' Court, and they are not to be surcharged with the apparent loss resulting from the farming operations. See *Woollen v. Frick,* 46 Md. 231; *Abell v. Abell,* 75 Md. 44, 64, 23 A. 71, 25 A. 389; *Bantz v. Bantz,* 52 Md. 686, 696, 697; 3 *Woerner's Law of Administration,* sec. 513, p. 1770; *Dennis v. Dennis,* 15 Md. 73, 106, 123, 124; 2 *Perry on Trusts* (2nd Ed.) sec. 528, p. 894; *Hohman v. Hohman,* 164 Md. 594, 616, 165 A. 812. Compare *Tate v. Norton,* 94 U.S. 746, 24 L.Ed. 222, 223; *Sewell v. Slingluff,* 62 Md. 592, 599, 600.

The court has not overlooked the rule that, where the devise is not to the executor, a general power conferred upon him to sell land is usually regarded as a naked

power of sale and does not vest in the executor the title or any right of possession, and this is true whether the power be given for the purpose of paying debts or legacies or making distribution of the proceeds of the land, unless the will confers control of the possession upon the executor. *Getzandaffer v. Caylor*, 38 Md. 280, 283. In the will at bar the power is a power in trust because it is a peremptory power to sell the land for the purpose of its ultimate conversion into money so as to pass as a part of the residuary estate, which is composed of the combined proceeds of the sale of the land and of personalty. Until the sale of the land, the executors are authorized to demise it. The effect of the terms of the will is to make the rents and yield of the land accruing due after the testator's death assets of the estate, and to pass along with the other blended assets with the residue, so the testator's heirs at law and beneficiaries under the will are, *qua* heirs or *qua* devisees, not to take nor have any right to intermediate rents and proceeds of the land accruing, due or arising after the death of the testator. The terms of the will in the instant case gave the executors possession of the land for the use of the estate. 3 *Schouler on Wills* (6th Ed.), sec. 1986; *Bantz v. Bantz*, 52 Md. 686, 696, 697; 1 *Jarman on Wills* (6th Ed.) *614, *615; *Woerner on Administration* (3rd Ed.) sec. 518. See *Brearley v. Molten*, 62 N.J.Eq. 345, 50 A. 317, 320; *Hurford v. Haines*, 67 Md. 240, 245, 9 A. 540; *Stake v. Mobley*, 102 Md. 408, 415, 62 A. 963; *Miller on Wills*, sec. 377.

2. The exceptants unfavorably comment on the price obtained for a motor boat. The executors reported on April 14th, 1931, that the motor boat of the testator had been appraised at $1,500, which was said to be largely in excess of its value. The executors further stated that the boat was kept in storage at the cost of the estate, and was practically useless in the local waters. It was declared to be becoming less valuable. Under the circumstances, and because of the further fact that, although the executors had sought to find a purchaser, their best

offer was $500, the executors were convinced that the boat had best be sold at the offer of $500. The court thereupon directed the sale to be made. The testimony shows that, in view of its age, type, safety, utility, and condition, the boat was well sold.

3. In order to understand the questions with respect to the depreciation in market value of the securities, numerous facts must be first stated. On the death of the testator, his debts were few but large in the aggregate. He owed a note of $700 to one creditor; a mortgage debt of $4,000 upon his farm; and a debt of $228,073.15 to his brokers, which was secured by collateral. The major part of the estate was represented by these pledged securities. The testator had dealt in securities through the house of Pask & Walbridge, a firm of excellent reputation with a seat on the New York Stock Exchange. It was the testator's method to buy on margin industrial securities which, while they would not have the highest rating for strength and safety, would, in the judgment of his brokers, at length increase in market value because of what they esteemed to be their substantial assets, favorable conditions, and prospects. These purchases would be pledged with the brokers as collateral to secure the payment of the residue of their cost. In the event the market value of the pledges declined, the customer was obliged to reduce his indebtedness or to pledge additional securities, so that a customary margin between the collateral and the indebtedness would be constantly maintained. The collateral was in the possession of the pledgee and, unless the pledgee otherwise agreed, the pledgor could not sell the pledged securities except through the agency of the pledgee and for the purpose of having the proceeds of sale applied to the subsisting indebtedness.

The estate of the testator that came into the possession of the executors was not able to pay the indebtedness to the brokers, except by a sale of the pledged securities and the application of their proceeds to the indebtedness. In the appraisement of the securities their value was taken

as of July 23rd, 1930, the day of the testator's death, as was required for the purposes of state and federal taxation. Code (Supp. 1935) art. 62A, secs. 10, 11; U. S. Code Ann. title 26, sec. 1094, 44 Stat. 70, sec. 302 (see 26 U. S. Code Ann. sec. 411). The aggregate of the then value of his securities as thus appraised was $552,719.25. The appraisement was actually made on September 3rd, 1930, when the market value of the securities had substantially declined from the appraisement. By October 1st there had been a further loss of market value, and the executors were confronted with the problem of requesting the pledgee's sale of the securities on a falling market at less than the appraised value.

Since the fall of 1929 there had been a gradual and, at certain periods, a violent decline in the market value of securities generally, and those which the testator had bought had participated in this loss of market value. The pledged and unpledged securities of the estate had been bought by the testator on his own, and his brokers', judgment that the stocks, because of their inherent value, would eventually rise above the prices paid when they were bought. The state of the stock market reflected many conditions. Whether the adverse factors had ended, and their effect upon the financial situation had been exhausted, was a matter about which there was ground for a reasonable difference of opinion. In reaching their conclusion, the executors had to exercise their best judgment as reasonable men, under all the circumstances, after seeking and obtaining expert advice. They consulted the house of brokers who had bought the securities and with whom the major portion were pledged, and heard their opinion. The executors knew that, for some time before his death, the testator, in the face of a falling market and a disturbed financial situation, had evidenced his own opinion by not attempting to sell the securities. So, acting upon their judgment, the executors came to the conclusion of the brokers, that the securities should not be sold for less than their appraisement, and submitted their position, on October 21st, 1930, to the Or-

phans' Court. The court took their view, and passed on the same day a general order to the effect that the executors should have authority to sell "such stock or stocks as they, in their judgment may deem advisable in the best interest of this estate, provided that such sales be not made at less than the appraised value of said stocks without further order of this Court. And it is further ordered that all sales be reported to this Court as and when made."

In respect of the stocks pledged as collateral, the order applied to the extent that it would authorize the executors either to approve or request a sale by the pledgees at not less than the appraised value, but the pledgees' right to sell, which originated in and was defined and assured by the contract of pledge, was unhampered by the limitations of the order. Any sale made before the payment of the debt and for its satisfaction was by and for the use of the pledgees, and none of the proceeds of sale was receivable by the executors until the sales had paid in full the debt to the pledgees.

With this situation in mind and in possession of the pertinent facts, the court passed an order which restricted the executors to the appraised value or better either in approving or requesting a sale by the pledgees or in making a sale of unpledged securities. The will had not authorized the executors to sell without application to the Orphans' Court, so the court had the power to pass the order, since the statute provides that a sale of personalty or of an interest therein, if made by the executors without the authorization of the court, is void, and no title passes to the purchaser. Code, art. 93, secs. 290-296; *Brooks v. Bergner,* 83 Md. 352, 354, 35 A. 98; *Lochary v. Corrigan,* 132 Md. 371, 372, 373, 103 A. 1006; *Weinstein v. Boyd,* 136 Md. 227, 228 110 A. 506; *Lowe v. Lowe,* 6 Md. 347, 356-358; *State v. Talbott,* 148 Md. 70, 79, 128 A. 908; *Fox v. Harris,* 141 Md. 495, 499, 119 A. 256. The effect of this general order was to prevent a sale of stock or of any interest therein at less than its appraised value, without the further order of the court. The proof is that

at no time from the day of the testator's death did any stock of the testator have a market or other value which was either equal to its appraised value or was in excess of it. At no time, therefore, could the executors have sold or agreed to sell or request the pledgee to sell any stock or interest whatsoever in any stock at less than its appraised value, unless by a later order of court to that effect. It follows that the executors cannot be held legally responsible for any losses which might arise from an obedience to this order of court, unless it be affirmatively shown that there was some other act of omission or commission that would be a breach of duty committed by the executors which causatively occasioned the losses that had resulted from a decline in the market price of the securities. The criterion of value thus fixed at the appraisement and an early crisis in the affairs of the estate compelled the executors to ask for its modification with reference to certain shares of stock in three Canadian banks and in a bank and a trust company of Scranton. The progressive decline in market value of the securities pledged required additional collateral or payment on account to meet the margin exacted. The market value of every one of the stocks pledged was less than the appraised value. There were no other available securities to be pledged, as the Canadian and Scranton stocks were not acceptable as collateral on the New York Stock Exchange. Furthermore, those stocks had relatively suffered less loss of market value. For the reasons assigned the executors recommended these shares of stock for sale, and the court passed, on October 28th, 1930, an order authorizing their disposal at not less than a specified price. The amount realized was credited on the debt to the brokers, and temporarily met the requirements of the loan as to margin.

With the general order in effect, except with reference to the stocks which had been withdrawn from its restrictions and sold pursuant to a subsequent and particular order of court, the remaining securities could not be sold by the executors. Accordingly, on August 14th, 1931,

they filed a petition in which was stated that, unless an extension of time be granted, the executors would be required to state an account and pay the collateral inheritance tax on or before August 23rd. The basis for this extension was that, because of the indebtedness of the estate and the expenses of administration, it was necessary to dispose of a portion of the securities, but that, "because of the business depression now existing throughout the country all securities, as well as other classes of property, have suffered unusually large depreciation in value and the sale of any securities" by the executors at the time to enable them to close the estate would involve a large financial loss to the estate. The executors further set forth that "with the betterment of business conditions which your petitioners are hopeful will occur in the next few months, the sale of securities could be made without placing upon said estate such large financial losses," and concluded their petition with the prayer "that an order may be passed by your Honorable Court extending the time for the closing of said estate and the payment of such collateral taxes as may be payable thereon for such reasonable time as the Court may deem proper."

The court had the power to grant the extension, but the executors had no right to compel the court to give an extension by the mere seeking of it. So the exercise of the power involved an exercise of the court's sound discretion, and it might grant or refuse the extension or reconsider and modify or rescind its action, according to their decision of what a proper administration of the estate required. In this instance the court passed the order, and fixed the period of the extension at six months. Upon later petitions in which the executors assigned the same grounds for their request as in their first, the court passed seven other orders successively extending for six, four, and three month periods the time of settlement, until November, 1934. On an oral application the court later extended the time to February 20th, 1935, and this order was revoked, on January 29th, 1935, and the

time prolonged until the disposition by this court of an appeal from an order ratifying a sale of real estate by the executors.

If the court had been of the opinion at the time of the first application for an extension, or at any of the subsequent times of the later applications, that the executors should sell the securities at the then market, it would have refused the prayer of the petition or granted an extension in connection with an order that the securities be forthwith sold at the market price, and that the administration account be closed by the time of the expiration of the extension granted.

The question when to sell was the principal and constant problem in the administration of the estate. It challenged the court's attention from the beginning until the final sale was made. In addition to the occasions mentioned, the executors on December 29th, 1931, advised the court that, pursuant to the order of court passed on October 28th, 1930, they had sold securities, and had paid about $130,000 on the loan with the brokers, leaving about $98,000 due; and that, because of further depreciation in the value of the collateral, the brokers had demanded that the executors furnish further collateral, or reduce the debt, which the executors could not do, but that, in order to prevent a liquidation of the account and save the estate the great loss of such a course, the executors had assented to the sale by the brokers at the market price of certain named pledged securities, which were not yielding dividends. The executors asked that their course be approved, and their action was ratified and confirmed by the court.

The decline in value of the securities continued until towards the close of the year 1931 the equity in the pledged stock was almost gone. The resources of the estate were inadequate to avert a total loss in the securities. It was then that one of the executors, Edward De Witt, began to pledge his personal securities to protect those of the estate. The market value of the securities continued to go lower until in July, 1932, the debt to the

brokers was as much as $30,000 in excess of the value of the pledged securities. The total value of the securities pledged by De Witt was about $75,000, and he gave to the brokers his personal guaranty of the Goldsborough account. In the absence abroad of De Witt, the other executor, Stephen J. McGarrigle, furnished further collateral when it was required and also gave his personal guaranty of the debt.

The lowest point in depreciation was reached about the middle of 1932, and from that depth the market rose and fell, alternately, from 1932 until the beginning of 1935, when the market price of securities began an advance and rose as a rule, at the close of the year, approximately to the general level of industrial securities of the midyear of 1930. During this period there were two preliminary transactions and a final one in respect of the securities. The first began on January 2nd, 1934, and concerned 1,000 shares of the preferred stock and 500 shares of the common stock of the Passwall Corporation. In the inventory returned, the preferred stock was appraised at $35 per share and the common stock at $5 per share. The name of the corporation was changed to the Eastern Shares Corporation. A proposition had been submitted by which an investment trust organization, called the Equity Corporation, offered to exchange its stock for that of the Eastern Shares Corporation. By this arrangement the estate would receive 850 shares of the preferred stock of the Equity Corporation and 2500 shares of its common stock. The executors stated that they believed this would be an advantageous exchange, and the court authorized it. The original stocks were pledged with the brokers, and the exchanged stocks became a substituted collateral. On April 24th, 1934, the court authorized a sale of the preferred and common stock of the Equity Corporation. The proceeds of sale were received by the brokers and credited on the indebtedness. The transaction was for the benefit of the estate. The proof is decisive on that point. The record is that the best offer for the original stock was $22,250,

and the sale of the substituted stock was for $26,562.70, which was a net gain of $4,312.70.

The second transaction is in connection with the sale of 250 shares of stock of Socony Vacuum Oil Company, which was the only asset of the estate then available for conversion to meet the demand for payment of a federal estate tax of $5,849.50, which had been assessed against the estate and which was drawing six per centum interest. The court on March 13th, 1934, authorized its sale at the best price obtainable for the purpose of making this payment.

It will be observed that these orders, as well as those, except the first, which preceded them with respect to the sale of stock, were in reference to the sale of particular shares of stock. With regard to all other shares or equitable interest in shares not so specially mentioned, the original authority to sell at not less than the appraised value, except upon order of the court, was operative and constituted the sole authority of the executors to sell or to direct the pledgee to sell. So, when the Orphans' Court determined that all the interest of the estate in the securities should be sold at the market price and without reference to the appraised value, it passed its orders to that effect. On July 25th, 1934, the court directed that all securities belonging to the estate be sold on the market at the best prices obtainable before November 1st, 1934. They were not so sold by the executors, and on February 26th, 1935, a superseding order was passed in more definite and precise terms and with special application to the pledged stock. The order ran that the executors "sell at the market value thereof, or at the most satisfactory price they can obtain therefor, all or any of the stocks or other securities belonging to or the property of the said estate, whether in their hands or in the hands of the pledgees or other holders thereof, that may in their judgment or discretion be necessary or proper for the purpose of paying the debts and expenses and costs of administration of the said estate and for

making distribution thereof or for any other purpose that to them may seem advisable."

It was under this last order that the brokers, at the instance of the executors, sold all the pledged stock in their possession at the best prices obtainable. The difference between the appraised value of the securities as of the day of the testator's death and the gross amount of the proceeds of sales is estimated at $295,889.47. The depreciation mentioned is obtained by taking the appraised value of the securities on the day of the testator's death. Between that time and the time of the qualification of the executors and the making of the appraisement, the securities had sustained a substantial decline in market value. Although the record affords no basis for an accurate computation, a shrinkage in value during that period of about $85,000 is indicated. Upon no tenable theory could the executors be surcharged with a decline in value which had thus occurred before they had the right to ask leave of the court for direction in reference to the securities. There is, however, a large difference of amount between the value of the free and and pledged securities from the time the executors assumed their duties and became responsible for their course with regard to these securities, and the amount later realized on their liquidation. The question is whether, under all the circumstances, the executors are to be surcharged with this difference.

In addition to the facts as found and stated, the court finds the administration of the executors to be wholly free of misconduct. Their reports and accounts were marked by accuracy and clearness and completeness. Nor does there appear to be the omission of any material fact in any of their petitions and reports. These, in connection with the other papers and proceedings of record in the estate, put the court in possession of all that was requisite for the decisions made and orders passed. Furthermore, the proceedings before the orphans' court are largely *ex parte* and informal; and their administrative orders are generally the result of conferences and dis-

cussion with the personal representatives upon the presentation by petition or otherwise of matters requiring the determination and action of the court.

From this recital it appears that, during the period beginning with the grant of the first order of sale and closing with the superseding general order of sale, dated July 10th, 1934, which directed a sale of the securities at the prevailing market price, the executors, with the exception of the orders noted authorizing the sale of specific securities, were restricted to a sale at not less than the appraised value, which had not been attained. Under the facts which have been stated there remains for determination the jurisdiction of the Orphans' Court to pass the orders mentioned, and the effect of its orders of sale and of its extensions of the time of an account by the executors; and the measure of care and diligence required of the executors under the circumstances, in which there was neither fraud nor misrepresentation nor material nondisclosure.

On this record there is no question of the loss having been sustained on securities which had been acquired by the executors during the course of their administration. The testator had purchased the securities and incurred the indebtedness. His personal representatives in the settlement of the estate were his executors. They were given full discretionary power to sell the securities for investment of the proceeds. Inasmuch as the estate was not sufficient to discharge the indebtedness without a sale of such of the pledged securities as were sufficient for that purpose, the problem of the executors was when and which of the securities should they direct the brokers to sell, as upon the return of the inventory and appraisement the market value of the securities was well in excess of the indebtedness.

The testator had instructed his executors to pay all his just debts and funeral expenses as soon as practicable after his death, but this injunction was no more than the due discharge of their office required. *Perry on Trusts* (7th Ed.), sec. 439; *White v. Donnell*, 3 Md. Ch.

526, 533, quoting from *Webster v. Hall,* 8 Ves. 410. While it was the function of the executors to manage and dispose of the estate of their testator in accordance with the terms of his will, the executors acted under the supervision and control of the legal authority of the Orphans' Court. In their performance of their duties they were the officers of this court, which was created for the especial purpose of aiding, directing, and controlling, within the limitations of the statutory jurisdiction conferred, the personal representatives of decedents in the settlement of estates. *Byers v. McAuley,* 149 U. S. 608, 615, 13 S. Ct. 906, 37 L. Ed. 867, 871; *York v. Md. Trust Co.,* 150 Md. 354, 363, 133 A. 128. It was the tribunal provided for the recourse of executors and administrators.

The interest of the testator in all his securities passed to his executors. This is true of his interest in the pledged securities, because the executors succeeded the testator as the pledgor, and held the equity of redemption in the pledged securities. *Hess v. Rau,* 95 N. Y. 359; *York v. Md. Trust Co.,* 150 Md. 354, 360, 133 A. 128. In the absence of any express authorization in the will to sell without application to the Orphans' Court, the executors could neither sell directly the free securities nor direct the brokers as their agent to sell the pledged securities in the possession of the brokers. In order for the executors to sell or to authorize an agent to make sale of any personal property, the proposed sale must be made pursuant to an order of the Orphans' Court. It therefore became necessary for that court to determine, first, the necessity of the application for an order to sell, and then to prescribe and direct its manner and terms. *Bagby's Executors and Administrators* (2nd Ed.), secs. 57, 58; Code, art. 93, secs. 290-293, 142; *Brooks v. Bergner,* 83 Md. 352, 354, 35 A. 98; *Lochary v. Corrigan,* 132 Md. 371, 373, 103 A. 1006; *Weinstein v. Boyd,* 136 Md. 227, 233, 110 A. 506; *Alexander v. Fidelity & Dep. Co.,* 108 Md. 541, 546-549, 70 A. 209; *Crawford v. Blackburn,* 19 Md. 40, 42; *Blackburn v. Craufurd,* 22 Md. 447,

465, 466; *Lowe v. Lowe,* 6 Md. 347, 356-358; *York v. Md. Trust Co.,* 150 Md. 354, 357, 133 A. 128; *State v. Md. Casualty Co.* 164 Md. 69, 75, 77, 163 A. 856.

It was therefore a condition precedent to a valid sale of personalty by the executors that they obtain an order of sale. The necessity for a sale may not exist at the time of the inventory and appraisement. The market may be unfavorable because of demand or season or, in the absence of a testamentary direction to convert, the necessity for a sale may be a later development on account of partial or total failure of liquid assets to meet obligations of the estate or of an inability to make a distribution in kind. So, while the uncertainty in the necessity of a sale or its opportuneness makes its time variable according to the condition of its necessity, some general indication as to the time within which a sale should be generally made is afforded by the statutory requirement that a personal representative shall, as a rule, return the inventory and appraisement of goods and chattels within three calendar months from the date of the letters, and state the first account of his administration within the period of twelve months from the date of the grant of his letters of administration; and, if not then fully administered, thereafter periodically at not greater than intervals of six months, as the court may allow, until the estate shall appear to be fully administered. Code, art. 93, secs. 211-219, 1-3, 103, 109, 113, 124; *Hilgartner v. Hilgartner,* 127 Md. 270, 274, 96 A. 519; *Handy v. Collins,* 60 Md. 229, 235-236; *Clarke v. Sandrock,* 113 Md. 422, 77 A. 644. These provisions with respect to the time of accounting, and implicitly with respect to the time within which sales should be made, are obviously directory, since the time of settlement is subordinate to the exigencies of a reasonable and prudent administration. Estates of decedents are administered during normal and abnormal times and conditions, and courts will modify customary procedure to meet particular problems. The executor or administrator cannot, in every instance, collect and reduce into his possession the assets of the estate and be

prepared to state an account in twelve months. The payment of creditors, the conservation of the estate, and the execution of the will, where there is one, are considerations which are paramount to the policy of securing a speedy settlement. Where there is an occasion for a settlement or accounting within the time prescribed, the orphans' court may compel the executor or administrator to make a sale or state the account. So, if special circumstances have supervened which make the sale or accounting impractical at the indicated time, the court may allow a reasonable extension or, where no prejudice is done, waive a past noncompliance. The grant to the court of "full power to take probate of wills, grant letters testamentary and of administration, direct the conduct and accounting of executors and administrators, superintend the distribution of intestates, secure the rights of orphans and legatees and administer justice in all matters relating to the affairs of deceased persons" must be construed in connection with the provisions of the statute which relate to the time of sales and rendering accounts, and so confers upon the court jurisdiction to waive and enlarge the time for the sale or account. *Woerner on Administration* (3rd Ed.), secs. 538, 1842; *Dugan v. Hollins*, 11 Md. 41, 80; *Belt v. Hilgeman, Brundige Co.*, 138 Md. 129, 135, 136, 113 A. 721; *Stake v. Stake*, 138 Md. 51, 53, 113 A. 591; *Fulford v. Fulford*, 153 Md. 81, 90-93, 137 A. 487; *Biddison v. Mosely*, 57 Md. 89, 93, 94; *Crothers v. Crothers*, 121 Md. 114, 119, 88 A. 114; *York v. Maryland Trust Co.*, 150 Md. 354, 133 A. 128; *Macgill v. Hyatt*, 80 Md. 253, 256, 30 A. 710; *Collins v. Cambridge Maryland Hospital*, 158 Md. 112, 115, 148 A. 114. See *Wilmer v. Placide*, 119 Md. 49, 52, 86 A. 43.

There are no more common place proceedings in the orphans' court than the passage of regulatory orders in matters which relate to inventories, appraisements, sales, and accounts. These orders are usually *ex parte*, but this circumstance is not suffered prejudicially to affect parties in interest. In matters not within the discretion

of the court, relief is afforded by appropriate proceedings for a review, in which the court may rectify any error in fact or in law. Any of the beneficiaries under the will of the testator could have challenged the propriety of the orders passed which concerned the sale of the securities and the statement of accounts, and have asked that the executors be compelled to make sale of the securities and render an account, by bringing the matter to the attention of the court, and requesting a hearing on the questions raised. Under proper proceedings the judgment of the court could have been reviewed by this tribunal. The beneficiaries were all adults and were charged with a knowledge of the statutory provisions which governed the administrations of estates, and the time within which the personal representatives usually bring an estate to a close. They were also bound to know that an appeal from an order of the orphans' court must be taken within thirty days. *Bagby's Excrs. & Admrs.* (2nd Ed.) 173; Code, art. 5 sec. 66; *O'Neal v. Bridge Co.*, 18 Md. 1; *North Laramie Land Co. v. Hoffman*, 268 U. S. 276, 283, 45 S. Ct. 491, 69 L. Ed. 953, 957. The delay disclosed on this record was, after the expiration of the period of one year, either actually known to the beneficiaries, or imputed to them because of the provisions of the statute. The records of the Orphans' Court disclosed all the orders now assailed and the grounds upon which the court acted. *Williamson v. Morton*, 2 Md. Ch. 94, 102; *Miller v. Williamson*, 5 Md. 219, 231; *Marbury v. Ehlen*, 72 Md. 206, 218, 19 A. 648. Moreover, on June 21st, 1934, the executors filed a detailed report and account of all their proceedings to June 8th, 1934. All the beneficiaries, however, stood by without taking any action to enforce a sale or an accounting during the period which extended from August 5th, 1931, a year after the grant of letters testamentary, until May 31st, 1935.

The orders extending the time for the sale of securities and the statement of an account were procedural in nature, and the parties affected were charged with

knowledge of their existence from the time they had actual notice of their passage. Actual notice may be express or implied. As was said in *Mayor etc. of City of Baltimore v. Whittington,* 78 Md. 231, at page 235, 27 A. 984, 985, "Implied notice, which is equally actual notice, arises where the party to be charged is shown to have had knowledge of such facts and circumstances as would lead him, by the exercise of due diligence, to a knowledge of the principal fact." On the facts of this record it is obvious that the beneficiaries knew that the delay in the sale of the securities and in the statement of the account beyond the year after the grant of letters testamentary as prescribed by the statute was unusual and unauthorized except by order of the Orphans' Court, whose records, upon an examination by them, would disclose what orders had been passed. If the parties did not make this examination, they did not exercise due diligence. A failure to be duly diligent visits upon them an implied notice of what they would have been so led to learn from the sources which were known and open to them. The parties took no action from August 5th, 1931, to May 31st, 1935, and so, because of lapse of time and laches, cannot now raise the question that the court was without power to grant extensions of time by *ex parte* orders of record in matters within its jurisdictions, and not procured by fraud, deceit, or mistake. *Bagby's Executors and Administrators* (2nd Ed.) 153; *Goldsborough v. De Witt,* 169 Md. 463, 469, 473, 474, 182 A. 324; *Hunter v. Baker,* 154 Md. 307, 330-332, 141 A. 368; *Redman v. Chance,* 32 Md. 42, 52, 54; *Perrin v. Praeger,* 154 Md. 541, 549, 550, 140 A. 850; *Edwards v. Bruce,* 8 Md. 387; *Dugan v. Hollins,* 11 Md. 41, 80; *Richardson v. Billingslea,* 69 Md. 407, 409 16 A. 65; *Yakel v. Yakel,* 96 Md. 240, 242-244, 53 A. 914; *Holland v. Enright,* 169 Md. 390, 396, 397, 181 A. 836.

The passage of an order by the orphans' court authorizing a sale of personal property is ordinarily a matter in the reasonable exercise of a lawful discretion. *Crawford v. Blackburn,* 19 Md. 40; *Kuykendall v. Devecmon,* 78

Md. 537, 543, 28 A. 412; *Ex parte Shipley,* 4 Md. 493; *Lowe v. Lowe,* 6 Md. 347, 356-358. If the court should refuse the authority, the representative, if not otherwise in default, would be exonerated from a resulting loss. *Ex parte Walsh,* 26 Md. 495, 498. And so an order passed in virtue of its lawful discretion will protect a personal representative, who acts in pursuance of the order. *Fidelity & Deposit Co. v. Freud,* 115 Md. 29, 31, 80 A. 603; *Carlysle v. Carlysle,* 10 Md. 440, 447; *O'Hara v. Shepherd,* 3 Md. Ch. 306; *Scott v. Fox,* 14 Md. 388, 394. See *York v. Md. Trust Co.,* 149 Md. 608, 618, 131 A. 829; *McCrory v. Beeler,* 155 Md. 456, 460, 142 A. 587. Compare *Johnson v. Webster,* 168 Md. 568, 576, 179 A. 831 (no order).

While such is the general effect of the orders of the Orphans' Court, and while they cannot now be rescinded and revoked, they were obtained on the initiative and upon the recommendation of the executors, who, the court finds, were not guilty of fraud, deceit, or misrepresentation, nor were the orders founded in mistake. Nevertheless the members of the orphans' court are generally neither trained nor grounded in the law, nor are they experience nor schooled in the value, soundness, and safety of securities. *Munnikhuysen v. Magraw,* 57 Md. 172, 177. For these reasons the members of the court rely largely upon the representations made to them by executors and administrators, and necessarily depend, in the passage of *ex parte* orders, upon the care, prudence, and diligence of these officers in the ascertainment of the facts upon which they request the sanction of the court. Hence, if the executors were negligent in reaching the conclusion that the sale of the securities should be deferred, and their neglect in the discharge of this duty had induced the court to pass the orders here in question and loss had thereby been caused the estate, the executors should be surcharged to the extent of the actual loss so occasioned. See *Hoffman v. Armstrong,* 90 Md. 123, 129, 44 A. 1012; *Miller v. Gehr,* 91 Md. 709, 715, 47 A. 1032 *Friedenwald v. Burke,* 122 Md. 156, 164,

165, 89 A. 424; *Shultz v. Houck,* 29 Md. 24, 27. The measure of the duty of the executors in determining when and what securities should be sold was to act in good faith and with the same degree of care as a reasonable and ordinarily prudent man in a similar situation would exercise in coming to a decision as to the advisability of a sale of like securities of his own which he desired to liquidate. When executors so act, they are not assurers of the result of their decisions in matters of judgment, and should not be held responsible for any losses accruing in the management of the trust property. *McCoy v. Horwitz,* 62 Md. 183, 188-190; *Oesterla v. Gaither,* 90 Md. 40, 44-46, 44 A. 1035; *Johnson v. Webster,* 168 Md. 568, 575, 576, 179 A. 831; *Fox v. Harris,* 141 Md. 495, 500, 119 A. 256; *York v. Md. Trust Co.,* 149 Md. 608, 618, 131 A. 829; *Gray v. Lynch,* 8 Gill, 403, 429-433.

As has been stated, when the executors were granted letters testamentary, they were confronted by a grave and difficult problem. The bulk of the testator's estate was represented by the equity of redemption in securities held by his brokers as a pledge for his indebtedness. Since the fall of 1929 there had been a gradual and, at certain periods, a violent decline in the market value of all securities. While market value is some evidence of actual value, it may be less or more, and the disparity tends unduly to increase in periods of financial distress. *Whiting v. Price,* 172 Mass. 240, 51 N. E. 1084; *Warner v. Benjamin,* 89 Wis. 290, 62 N. W. 179; *Davis v. Coshnear,* 129 Me. 334, 151 A. 725. In coming to a decision, the executors had to take into consideration that the testator had bought the securities to hold because of their intrinsic value; and, in his will of January 15th, 1930, he had authorized his executors, in their discretion, to appropriate any of the securities to the purposes of the trusts created by his will. Under these circumstances and the prevailing unfavorable market conditions, which it was believed, could not continue, the executors sought and obtained expert advice. Their judgment was then and subsequently that the securities should not be sold

but should be held until the period of depression was over. Furthermore, the weight of the testimony establishes that, in the months of December, 1930, and January, 1931, the owners of an undivided sixty-three eightieths of the real and personal estate, and the three life tenants of the remaining undivided seventeen-eightieths of the estate given in trust, expressed to the executors in conference and by letter their judgment and desire that no step be taken to have the securities sold on a falling market during a period of financial depression, and that the account with the brokers should not be closed until the return of normal financial conditions. *O'Hara v. Shepherd*, 3 Md. Ch. 306, 313. Nor did any of the remaindermen in the seventeen-eightieths of the estate given in trust indicate any disagreement with the position taken by their parents and life tenants.

It follows from these circumstances that the executors are not shown to have been negligent, but to have acted in good faith, with diligence, care, and caution and with that degree of prudence which a reasonable man would have exercised in the conduct of his affairs in a similar situation. All that the evidence established is an honest mistake of judgment, and, however unfortunate the result, the executors are not to be surcharged, and so penalized for a mere mistake. The law does not require infallibility of decision in its fiduciaries nor prescience. Having submitted in good faith and without negligence their judgment to the orphans' court for its action, the executors are protected by the orders given. *Supra;* and *Johnson v. Webster,* 168 Md. 568, 575-578, 179 A. 831; *Ex Parte Walsh,* 26 Md. 495, 498; *Stanley v. Safe Deposit & Trust Co.,* 87 Md. 450, 455, 40 A. 53; 2 *Woerner on Administration* (3rd Ed.) sec. 336, pp. 1112-1114; *Perry on Trusts* (7th Ed.) sec. 251; *In re Estate of Weston,* 91 N. Y. 502, 509-511; *In re Bartol Estate,* 182 Pa. 407, 38 A. 527; *In re Gardner's Estate,* 323 Pa. 229, 185 A. 804, 806, 807; *Peck v. Searle,* 117 Conn. 573, 169 A. 602-605.

There are many instances where, under different circumstances, the court has had occasion to surcharge per-

sonal representatives, as for profits made on assets of the estate (*Gephart v. Strong,* 20 Md. 522, 527), for negligence in collection of choses in action (*Hoffman v. Armstrong,* 90 Md. 123, 44 A. 1012; *State v. Wilmer,* 65 Md. 178, 186, 3 A. 252; *Hunt v. Gontrum,* 80 Md. 64, 30 A. 620), for unnecessary delay in the settlement and distribution of the estate and meanwhile keeping the funds in hand in his individual account and using them for his own purposes (*Garrison v. Hill,* 81 Md. 206, 31 A. 794; *Fidelity & Deposit Co. v. Freud,* 115 Md. 29, 33, 34, 80 A. 603; *Dorsey v. Banks,* 70 Md. 508, 510, 17 A. 272. Compare *Real Estate Trust Co. v. Union Trust Co.,* 102 Md. 41, 54, 55, 61 A. 228; *Mickle v. Cross,* 10 Md. 352, 362), for money deposited without authorization of the orphans' court, and lost by failure of depositary (*Bacon v. Howard,* 20 Md. 191. See *Ex parte Walsh,* 26 Md. 495. Compare *Carey v. Safe Deposit & Trust Co.,* 168 Md. 501, 518, 178 A. 242).

Again, unless expressly or impliedly empowered by the provisions of the will, the business of the testator or of the intestate is not to be carried on except for the purpose of realization, and, if the executor or administrator do more than this, he makes himself personally liable for the debts thus incurred, without any right of indemnity out of the estate of the decedent, and any assets acquired in the trade belong to the estate, subject to the right of the executor or administrator to be indemnified for what he has expended in obtaining these assets. 3 *Williams on Executors,* *1815-*1818.

Similarly an executor or administrator may not employ the assets to continue for profit a speculative account in securities of the testator or of an intestate, unless explicitly or impliedly authorized by the terms of the will in the event the decedent be testate. If, however, the testator or intestate had at death with brokers securities which he had previously bought and pledged with the brokers as security for part of the indebtedness incurred in their purchase, upon the understanding that, until he directed a sale or paid the indebtedness, the securities

would be held by the brokers so long as the decedent should keep, by payment, sale, or pledge of securities, the total market value of the pledged securities a certain fixed percentage or margin of value in excess of the indebtedness to the brokers, then, although an executor had no express nor implied authority under the will, it was the duty of both an executor and an administrator to perform the contract of the decedent with the brokers for such reasonable time as may be necessary merely for the purpose of a realization of the value of the securities. In taking this course, the personal representatives would not engage in a speculation for profit, but would act in the discharge of a plain duty. The problem was when the actual value of the securities would be realized by sale. A stable market in a period of normal economic conditions is usually when market value and actual value of securities most closely approximate coincidence. The then prevailing financial depression made for difficulty in the solution of this problem.

The first decision of the executors was early made, but it is obvious that from 1930 to 1935 was a longer period than would commonly be required to sell the securities at their actual value. It is equally clear that the purpose of the executors was not to make a profit but to secure a realization of actual value. The length of time was not the choice of the executors, but a consequence of the unexpected duration of the depression during which the market value of the securities remained below those of the appraisement.

In this period, the executors, at frequent intervals, considered the problem and brought the situation, with their view of it, before the Orphans' Court for its action, and every step taken was with the authorization of the court in full possession of the essential facts. It is true that, with the exception of several applications for emergency sales of specified securities, their judgment was not to sell at the current prices. Their conclusions were, however, formed in good faith and in the exercise of reasonable prudence and diligence. They would have been

false to their honest convictions and their duty, if they had recommended a sale. Their actions were pursuant to the authorization of the court in full possession of the material and relevant circumstances available. If the executors had requested a peremptory order of sale, there is no legal foundation for the supposition that the court would, in the exercise of their intervening judgment, have directed a sale, since, unless their own judgment had concurred with that actually expressed by the executors, the court would not have passed the orders on this record, but would have passed an order to sell. It follows that the losses sustained were directly attributable to an error of judgment on the part of the court with respect to the same conditions upon which the executors had based their views.

The executors were the testator's legal advisers. He selected them to settle his estate, and committed to them a large measure of discretion in its administration. He attested in solemn form his confidence in their capacity, integrity, and in soundness of their judgment. The will was executed in the midst of a financial crisis which would require the exercise of a judgment which, in its sequel, might prove to be unwise. Reasonable prudence, diligence, and good faith were all that the testator could expect, or his beneficiaries require. *Schouler on Wills, etc.* (6th Ed.) sec. 2368. The executors here displayed these qualities, and obtained for their conclusions the approval of the Orphans' Court. It is true the conclusions of the executors and court were, because of later unforeseen developments, a mistake, but a mistake made in good faith, and in the exercise of the diligence and care of reasonably prudent men in the management of their own affairs under similar circumstances, is not such negligence on the part of the executors as would require them to be surcharged with the loss ensuing as a direct consequence of the mistake. *Supra.*

The facts of this case are unusual, but the principles of law which must control are well established. In the light of these principles, the court does not find facts

by which any breach of duty by the executors is established. The authorities cited have been examined, and those on the part of the appellants are distinguished by a difference of facts. The circumstance that the executors here submitted their questions of sale and accounting to the Orphans' Court, which had the duty to decide them in the interest of the estate, and which did determine the course to be taken by the executors, distinguishes the cause at bar from many of the cases cited on behalf of the beneficiaries under the will; and, particularly, *Willinger v. German Bank of Baltimore,* 132 Md. 237, 241, 103 A. 433 (authorized for thirty days, but extended, without authority, for four years) ; *Mathews v. Sheehan,* 76 Conn. 654, 57 A. 694; 2 *Woerner on Administration* (3rd Ed.) p. 1114, n. 6; *In re Shinn's Estate,* 166 Pa. 121, 30 A. 1026, 1029, 1030; *Zimmerman v. Fraley* 70 Md. 561, 17 A. 560 (breach of direction in conventional trust).

In concluding the discussion on this point, it should be noted that, in the petition of the executors filed on July 25th, 1934, requesting a further extension, the Orphans' Court passed an order extending the time to November 1st and, apparently, of its own motion, directed that all the securities belonging to the estate should be sold during this period of extension at the best prices obtainable. This order was not obeyed, and was superseded. It does not, however, appear that loss was sustained by this delay.

4. The evidence is that the executors, pursuant to an order of the Orphans' Court, exchanged certain shares of the common and preferred stock of Eastern Shares Corporation (formerly called Paswall Corporation) for shares in the Equity Corporation. The transaction is assailed on the ground the executors had no power to participate in the substitution. The transfer was in good faith, and all the indications were that it was advantageous to the estate and a sound, prudent, and reasonable decision within the power of the executors to make. The corporation was about to be merged into a larger

one, and it was a choice of either a sale, an exchange of the stock, or of an assumption of the status of a dissenting minority stockholder in an accomplished corporate merger. The executors found that they could obtain more for the stock thus acquired than they could by a sale of the stock pledged, and that expert opinion favored the exchange of stock proposed. The Orphans' Court authorized the exchange of the stock and the sale of the new. The sum realized was substantially in excess of the price which could have been obtained for the original stock. If later it should happen that, on a liquidation by the company which had absorbed it, the ultimate value of a share should be greater than what the executors received, this fact of itself would not afford a basis to surcharge the executors. *Gray v. Lynch,* 8 Gill, 403, 429, 430; *McCoy v. Horwitz,* 62 Md. 183, 190. In the *Restatement of the Law of Trusts,* vol. 1, sec. 231, Comment f. Merger, p. 677, it is said, with respect to a corresponding situation, if the new shares are not such as the trustee should retain: "the trustee is under a duty to the beneficiary either to refuse the new shares and to take such cash options as may be available to him, or to accept the new shares and promptly dispose of them, dependent upon which course is prudent under the circumstances as they then exist." 4 *Schouler on Wills,* etc. (6th Ed.) secs. 2980, 2985. The objection that the transaction was violative of the testator's injunction to invest in securities which were legal under the laws of New York is not tenable, since the exchange was for the purpose of realization and not as an investment for the purposes of the trust created by the will. *Supra.*

5. A further exception to the account is based upon the allowance of interest on a note of $700 and a mortgage debt of $4,000 on the farm. The contention is that the executors should be charged with interest of $55.18 on the note and with $1,117.67 interest on the mortgage debt. The principal and interest of the note were paid within thirteen months of the grant of letters testa-

mentary, and so the exceptants have no ground of complaint on that score.

At the testator's death the mortgage lien on the farm was for $4,000, with interest from May 22nd, 1930, at six per centum. The interest of this debt on September 5th, 1931, thirteen months after the grant of letters testamentary, was $308.66. The excess interest of $809.01 paid would be the limit of the disallowance, on the theory that the account and payment of creditors should have been concluded at the expiration of thirteen months after the grant of letters. The statute relied upon is section 103 of article 93 of the Code, which provides that an executor "shall discharge all just claims known to him, or pay each claimant his proportion of the money then in his hands (retaining as herein directed), within thirteen months from the date of his letters, or within such further time, not exceeding four months longer, as shall be allowed by the orphans' court, on his making oath that he hath reason to apprehend that the personal estate and assets which are or shall be in his hands will be insufficient to discharge the just debts of and claims against the deceased; it shall likewise be his duty, once in every term of six months, after the first distribution, to make a distribution of the money which hath since come to his hands, until he shall have fully administered, and on failure, his administration bond may be put in suit." *Bagby's Excrs. & Admrs.* (2nd Ed.) sec. 70; *Gwynn v. Dorsey,* 4 G. & J. 453, 462; *State v. Wilson,* 38 Md. 338, 342; *Scott v. Dorsey's Excrs.,* 1 H. & J. 227, 235. The provisions of this section must be read in connection with its own implicit reservations, and with other sections of article 93 that are *in pari materia,* in order to learn the intention of the Legislature and give it effect. It will thus be found that the provisions constitute a general rule which is, however, subject to certain qualifications with reference to the exigencies of particular estates or conditions. One of the most patent is that there must have been funds in hand wherewith to have made or to make the payments contemplated. Section 290. An-

other is that the representative may exact that the payments be made at a meeting of creditors on a day fixed by the court. Sections 104, 122. A third is that funds may be retained to meet the requirements of future demands. Sections 105, 10, 108, 109. Again, sections 1-5, which relate to the rendition of accounts, and sections 85-102, which concern the requirements for the passage of debts by the court before the representative may pay and be protected, are to be considered, since these provisions are important in the determination of whether or not the estate is solvent or insolvent, and what amount is available for the discharge of claims or a distribution among creditors. And then, finally, section 243 confers upon the court the power to "direct the conduct and accounting of executors and administrators," and to administer justice in all matters relating to the affairs of dead persons. See sections 269, 271.

It would seem, therefore, the action of the Orphans' Court in postponing the sale of the personalty and the statement of accounts in the interest of the estate is a superior consideration to the payment of a debt, and that the executors, who could not sell and convert without the order of court, are not in such default, because of the time that had passed before the mortgage debt was paid, that they should be surcharged with interest on the circumstances shown by the record. The testimony of the executors is that the debt was not earlier paid because it was unsafe to do so on account of the necessity to pay taxes and the greater urgency of having funds to protect the requirements of the debt to the brokers. *Chase v. Lockerman,* 11 G. & J. 185, 208, 209; *Mickle v. Cross,* 10 Md. 352, 362. Furthermore, with the financial condition of the estate uncertain until the securities were sold, the executors did not have the certain legal right to pay general funds to a creditor whose claim was secured by property not available to another creditor. The situation was one where there were a comparatively small unsecured debt, a larger indebtedness which was secured by a mortgage on the land, and a great debt for

which were pledged a number of securities upon whose realization in actual value would depend not only the payment of the debt but also the fulfillment of the testamentary design. The solution of the problem of realization was put in jeopardy because of a subsisting financial depression. The court, by reason of the extraordinary economic circumstances, and for the sole purpose of securing the actual values of the securities and conserving the interests of the estate, had postponed, from time to time, the authorization of a conversion of the securities by sale and the statement of an account until the thirteen months from the grant of letters testamentary had passed. As the executors had neither enough money to pay all the debts nor to make distribution of the funds in hand with safety, because of the conflict of equities between the mortgagee and the pledgee with respect to a fund for the payment of unsecured claims generally, the delay thus occasioned in payment of the mortgage debt should and would not cast the penalty of interest upon the executors, when, as soon as the land was sold, the proceeds were properly applied to the payment of this preferred debt.

6. And, finally, the rate of commissions allowed by the Orphans' Court, if within the statutory bounds, is a matter in its discretion and not the subject of review on appeal. *Wilson v. Wilson*, 3 G. & J. 20; *State, to use of Manning v. Baker*, 8 Md., 44; *Handy v. Collins, Excr.* 60 Md. 229, 231; *In re Watts' Estate*, 108 Md. 696, 699, 71 A. 316.

The court finds no reason why the executors here are not entitled to their commissions, and no reversible error appears in their allowance. *York v. Md. Trust Co.*, 150 Md. 354, 361, 133 A. 128.

The other questions raised on this record have been considered, but, as they afford no sufficient ground for reversal, and are of comparatively minor importance, they will not be mentioned in the opinion.

The appeal in No. 37 by Eleanor Cook Goldsborough will be dismissed. It was abandoned by her subsequent ap-

peal docketed as No. 38. The costs will be directed to be paid out of the estate, as that will distribute the burden equitably among the appellants.

*Appeal in No. 37 dismissed, and orders appealed from in Nos. 38 and 39 affirmed, with costs to the appellees to be paid out of the estate by the executors.*